531 So.2d 773 (1988)
Richard E. JOHNSON, Jr. Plaintiff-Appellant/Appellee,
v.
KANSAS CITY SOUTHERN RAILWAY CO. Defendant-Appellee/Appellant.
No. 87-535.
Court of Appeal of Louisiana, Third Circuit.
September 7, 1988.
Rehearing Denied October 5, 1988.
Writ Denied December 9, 1988.
*775 Thoms & Hardy, Robert W. Thomas, Lake Charles, for plaintiff-appellant/appellee.
Scofield, Bergstedt, David Hoskins, Lake Charles, for defendant-appellee/appellant.
William J. Doran, Baton Rouge, McLeod, Little, William L. McLeod, Lake Charles, for defendant-appellee.
Taylor, Porter, Edwin W. Fleshman, Baton Rouge, for intervenor-appellee/appellant.
Before DOUCET, YELVERTON and KNOLL, JJ.
DOUCET, Judge.
This appeal arises out of an action instituted by plaintiffs, Richard E. Johnson, Jr. (hereinafter plaintiff), and his former wife, Cynthia Johnson, for damages sustained as a result of severe injuries received by plaintiff in an automobile-train collision at a railroad crossing in DeRidder. Named as defendants were Kansas City Southern Railway Company (hereinafter KCS), the City of DeRidder (hereinafter the City), and the State of Louisiana, Department of Transportation and Development (hereinafter DOTD or the State). Louisiana Health Service & Indemnity Company (hereinafter Blue Cross) intervened asserting a right of subrogation to plaintiff's rights against all defendants to the extent that it had paid for plaintiff's medical treatment.
A bifurcated trial was held. Plaintiff's claims against KCS were submitted to a jury while those claims against the State and City were submitted to the Court. The jury found that KCS was at fault in causing damages to plaintiff but that plaintiff had been contributorily negligent. The jury apportioned fault among the parties 45% to KCS, 40% to plaintiff, 10% to the City, and 5% to the State. Special and general damages to plaintiff were assessed at $850,000. No damages for loss of consortium were assessed to Cynthia Johnson, who, at the time of trial, was divorced from plaintiff. Following the return of the jury verdict the trial judge announced its decision that neither the City nor State were at fault in causing damages to plaintiff. A final judgment was signed awarding plaintiff $450,075.00, subject to the claim of the medical expenses subrogee, Blue Cross, for $79,196.00.
Plaintiff, intervenor Blue Cross, and defendant KCS now appeal citing substantive and procedural errors on the part of the jury and trial court. The assignments raised by Blue Cross are identical to some of those raised by plaintiff. Plaintiff's ex-wife did not appeal.
The accident occurred on May 2, 1982 in the City of DeRidder where North Street crosses some railroad tracks. The railroad tracks were owned by KCS, and North Street was a DeRidder city street. North Street runs in an east-west direction; the railroad tracks run in a north-south direction. North Street is paved with asphalt and this section is in a residential area of the City. The crossing was marked by the familiar white "crossbuck" sign located some six to seven feet from the rails. Further up North Street there was a round, metal, black and yellow advance warning sign. The posted speed limit on that stretch of North Street was 25 mph.
The accident occurred on a Sunday morning at approximately 6:15 a.m. It was near dawn and there was what was described by different witnesses as a light-to-heavy fog. The surface of the roadway was slightly wet from the fog. Plaintiff was driving with his headlights on in a westerly direction headed towards Leesville where he had a National Guard exercise scheduled for 6:30 a.m. It appears that he was running a bit late and was traveling 29 to 32.6 mph4 to 7.6 mph in excess of the posted speed limit. The train was approaching the crossing from the south and was proceeding with its headlights on at approximately 9.2 to 9.8 mph. The train consisted of three engines and twenty-five, or possibly twenty-six, cars. Based upon skidmarks it *776 was estimated that plaintiff saw or heard the train and began to react when he was 129 feet from the crossing. His passenger car skidded either slightly into the path of the train and was struck by it or skidded into the right front corner/side of the train. Upon impact plaintiff was thrown from his car and sustained severe injuries.

LIABILITY OF KCS
On appeal KCS first asserts that the jury erred in finding that it breached a legal duty owed by it to plaintiff and that such a breach was a legal cause of the accident and plaintiff's damages. At trial and on appeal plaintiff sets forth several bases of liability under both theories of strict liability and negligence. For purposes of resolving the issue of liability as to KCS we need only address one. The finding of liability by the jury is a finding of fact which a reviewing court may not disturb unless, (1) the record evidence does not furnish a sufficient basis for that finding, or (2) the finding is clearly wrong. Virgil v. American Guaranty and Liability Insurance Company, 507 So.2d 825 (La.1987); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Plaintiff claims that KCS failed to equip its train with a bell and a whistle or horn as required by former La.R.S. 45:561 (now La.R.S. 32:168) and/or failed to sound such a bell, whistle, or horn beginning at least 300 yards from the crossing as required by that same statute. KCS claims it fulfilled its duty as required by law.
In addressing this issue we will employ the duty-risk analysis. The following questions are considered in this analysis:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) Was there a duty owed by the defendant to protect the plaintiff from this type of harm arising in this manner?
(3) Did the defendant violate the duty owed?
See Mart v. Hill, 505 So.2d 1120 (La.1987); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Crowe, The Anatomy of a Tort, 22 Loy.L.Rev. 903 (1976); McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227 (1984).
Former La.R.S. 45:561 required that every railroad company equip each locomotive engine with a bell and a whistle or horn which, under normal conditions, could be heard at a distance of 300 yards. Regardless of other protection at a railroad crossing, a locomotive was required to sound the bell continuously or sound blasts of the whistle or horn in the manner provided by the Uniform Code of Railroad Operating Rules at least 300 yards from any street or highway crossing it approached at grade. The railroad operating rules provided for a certain sequence of blasts of the whistle or horn to be repeatedly sounded.
Plaintiff began reacting when the front of his car was approximately 129 feet from the railroad tracks. Since the plaintiff cannot remember the events immediately preceding the accident it is not known whether his reaction was prompted by his seeing the train or hearing it. An expert witness presented by KCS calculated that the train was 50-55 feet from the crossing when plaintiff reacted. He further calculated that plaintiff could have seen the train from a point 129 feet from the tracks and in fact, seems to assume that plaintiff began reacting when he saw the train. The expert testimony presented by both plaintiff and KCS leaves no doubt whatsoever that had plaintiff reacted tenths of a second sooner, he would have stopped before reaching the railroad tracks. According to one of plaintiff's experts the plaintiff had virtually brought his vehicle to a complete stop at the point of collision. Rejecting that supposition, one of KCS's experts estimated that plaintiff was still traveling approximately 10 mph at the point of the collision. He confirmed that even if plaintiff had been traveling at 32.6 mph when he reacted, he would in all probability have come to a complete stop before reaching the tracks if he had reacted only .6 of a second sooner.
*777 Defendant's alleged conduct will be considered a cause-in-fact of plaintiff's harm if it contributes to that harm. Crowe, The Anatomy of a Tort, supra. We find it reasonable to assume that, had the train sounded its bell continuously or sounded the repeated sequence of blasts on his horn or whistle for a distance of at least 300 yards from the crossing, and that bell, horn, or whistle was audible under normal conditions for a distance of at least 300 yards, plaintiff would have heard it and reacted at least .6 of a second sooner than he did and have come to a stop before reaching the railroad tracks. Therefore, KCS's conduct, the breach of a statutory duty, was a cause-in-fact of plaintiff's harm.
We have already set forth the duties imposed on KCS by La.R.S. 45:561. These duties are imposed to protect motorists such as the plaintiff who use the crossing. It has been held that the failure of a railroad engine to sound its bell, whistle, or horn as required by the statute constitutes negligence per se. Watson v. Illinois Central Gulf Railroad, 355 So.2d 1366 (La. App. 1st Cir.1978), writ denied, 357 So.2d 1168 (La.1978); Bertrand v. Missouri Pacific Railroad Company, 160 So.2d 19 (La. App. 3rd Cir.1964), writ denied, 245 La. 1075, 162 So.2d 571 (1964). Negligence per se is defined as "conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances ..." Black's Law Dictionary, 5th Edition (1979). However, we have gone ahead and examined whether the conduct was a cause-in-fact of plaintiff's injury and the extent of the duty imposed. We will next determine whether the record evidence furnishes a sufficient basis for a finding that KCS breached the duty or duties imposed on it by the statute and if so, whether such a finding would nevertheless be clearly wrong.
There were four KCS employees on the train at the time of the accident. The engineer, head brakeman, and brakeman, were all riding in the front engine while the conductor was in the third and last engine. The engineer testified that he began sounding the bell at the DeRidder yard limits, over a mile and a half before the North Street crossing. The engineer said the bell rang constantly and that he began blowing the whistle/horn when he reached the "whistleboard," a sign some 1,103 feet before the crossing. The sequence of the blasts was two long, one short, and an extra long.
The brakeman testified that the bell was "switched on" at the intersection of the KCS tracks and the Santa Fe railroad tracks which is slightly over a mile before the North Street crossing. This is over one-half mile after the engineer testified that he began sounding the bell. The brakeman also stated that the engineer sounded the whistle/horn but could not recall at what point he did so. The head brakeman testified that the bell was on and the whistle/horn was being sounded when the accident occurred but he gave no indication when either of these was first sounded. The conductor recalled hearing the train's whistle/horn being sounded approximately 1,000 feet from the crossing all the way to the crossing. The conductor did not mention anything about the bell being sounded.
KCS also produced Mark Griffith who formerly resided in an apartment building on North Street approximately 200 feet west of the railroad crossing. Griffith testified that on the morning of the accident he was awakened by the sound of the train's horn. He stated, "the horn was going a long time before he [the train] got to First Street." First Street is 2,623 feet, almost ½ mile, from the North Street crossing. This testimony conflicts with the testimony given by both the engineer and conductor who testified that the whistle/horn was sounded 1,103 feet and 1,000 feet, respectively, from the crossing. After awakening, Griffith turned on his television set and went into the bathroom. He said he heard the horn sounding "right on through until the accident happened." However, he did not hear the collision but was alerted that something was amiss when he heard the train engines stalled at the crossing. Another witness at trial, a *778 police officer who investigated the accident, testified that an unidentified black man came up to him and told him simply that he heard the whistle blowing.
Plaintiff presented two witnesses who passed over the crossing within minutes of the accident. Jesse Lambert and John Young both worked the 9:30 p.m. to 5:30 a.m. shift at a state correctional institution in nearby DeQuincy. These two men, along with a fellow employee, Steve Simmons, regularly rode to and from work together. On the morning of the accident the three were returning from work in Lambert's car. Lambert was driving, Young was sitting in the front passenger seat, and Simmons was asleep in the rear seat. They were traveling east down North Street, in the opposite direction from which plaintiff would soon be approaching. Lambert and Young both testified that as they crossed the railroad tracks they saw a train approximately 200 yards from the crossing coming from the south. Each man testified that he did not hear a bell, whistle, or horn. Young stated that Lambert slowed the car down as they went across and that they both looked down the tracks each way. Young recalled that the train's headlight was on and that there was a mild or medium fog that morning. Lambert remembered that his car windows were up and confirmed that in a deposition taken in November 1988, he stated that he had the defroster and fan on in his car.
After crossing the tracks, the men drove to a grocery store near Simmons's home, dropped him off, turned around, and drove back down North Street toward the tracks. Some distance from the crossing they noticed the train which at first they thought was moving. As they neared the scene they realized that the train was stopped on the tracks and that there had been an accident. Lambert testified that no other vehicles were backed up at the crossing in front of them and that his was the first vehicle to arrive on the scene from the east side of the tracks, the direction from which plaintiff had been proceeding. He estimated that after crossing the tracks it had taken him three or four minutes to drop Simmons off, turn around, and drive back. He also stated that on his way to drop Simmons off he noticed other vehicles pass him headed towards the crossing. One of these was apparently being driven by the plaintiff. As previously mentioned, plaintiff remembers nothing of events immediately prior to the accident or the accident itself.
We find that based upon the above evidence, the jury could have reasonably concluded that the train failed to sound its bell, whistle or horn at least 300 yards from the North Street crossing as required by former La.R.S. 45:561. The jury could have based such a finding on the testimony of Lambert and Young while rejecting that given by the KCS employees. As to Mr. Griffith and the unidentified black man, the jury could have concluded that the train did sound its whistle or horn, but only shortly before the accident. Griffith testified he heard the whistle or horn "a long time before" the train was at a point which was 2,623 feet from the crossing. His testimony was discredited by that of the train's engineer and conductor who stated the whistle was sounded 1,103 feet and 1,000 feet, respectively, from the crossing. Also, it doesn't make much sense to us that Griffith, who was asleep inside of an apartment 200 feet down from the tracks on North Street, could be awakened by the whistle more than 2,623 feet from the crossing while Lambert and Young could not hear the whistle straight down the tracks 600 feet away.
The engineer testified that seconds before the accident he glimpsed a pair of headlights on North Street approaching the crossing from the east. He stated that he was "fairly close" to the crossing at that time. Moments later he heard tires squealing and saw plaintiff's car skidding towards the tracks. We feel the jury could have reasonably found that the engineer did not have his bell on and only began to frantically blow his whistle after he glimpsed those headlights. This might explain why Lambert and Young did not hear a bell or whistle when they passed over the tracks less than a minute earlier. Lambert testified that it took him three or four *779 minutes after crossing the tracks to drop his fellow employee off and come back to the crossing. An expert presented by KCS estimated that the train could have been traveling 9.2 mph, which is 270 yards per minute. Although neither Lambert or Young heard a bell or whistle at any time that morning it is possible they crossed over the tracks, the plaintiff passed by them, and the engineer saw the plaintiff and blew his whistle when he was 50-55 feet from the crossing. It is possible the plaintiff reacted when he heard the whistle being blown for the first time rather than when he saw the train.
The plaintiff was familiar with the crossing and used it every day to go to and from work. He also traveled up North Street and across the tracks on his way to monthly National Guard drills as he was doing on the day of the accident. Both plaintiff and his wife testified that he always slowed down and carefully approached the crossing. Even if plaintiff was running late, if the train was sounding its bell or whistle for over 1,000 feet before the crossing, why would a person who usually slows down at the crossing fail to do so upon hearing a warning signal? We feel the jury could have concluded that he did not hear it because it wasn't sounded until too late. It appears that all of his car windows were up. But if the bell and whistle cannot be heard for at least 300 yards "under normal conditions," such as when a motorist is driving with his windows rolled up, then KCS breached the other duty imposed on it by the statute. No one who was at the scene, including a KCS employee who retrieved plaintiff's coat from his wrecked car, noticed that plaintiff's radio, windshield wipers, fan, or defroster were on, or had been on. There was no evidence that his car was not equipped with a muffler or that plaintiff had a hearing disability.
The facts of this case concerning the contradictory testimony of witnesses, particularly between Lambert and Young and the KCS employees, as to the sounding of a bell, whistle, or horn, are similar to those discussed by this court in Bertrand v. Missouri Pacific Railroad Company, supra. In Bertrand, one witness testified that he did not hear a whistle at all, one that he heard it when the train was 181 feet from the crossing, and the two trainmen testified that the whistle was sounded at least 1,800 feet before the crossing. Other witnesses testified that they heard a whistle but could not estimate when they heard it. In holding that there was sufficient evidence for the jury to conclude that neither the whistle nor bell were sounded for the required distance of 300 yards, this court cited a law review article, stating:
"As is pointed out by the author of the comment "Railroad Crossing Accidents in Louisiana", 15 La.Law Review 171 at page 175 "The most difficult problem arising under this statute (LSA-R.S. 45:561) is one of proof. The victim and his witnesses almost invariably deny having heard the signal and the trainmen `swear to the statute'."
We conclude that, even accepting that the bell, or, most likely, the whistle/horn, was sounded at some point before the collision, the record evidence furnishes a sufficient basis for a finding that none of them were sounded as required by law for a distance of at least 300 yards from the crossing. We are unable to say that such a finding is clearly wrong.

LIABILITY OF THE CITY OF DERIDDER
The trial judge found no liability on the part of the City. On appeal, plaintiff cites that finding as error and sets forth several bases of liability. We find no clear error in the trial judge's finding of fact as to the city's liability, because, in our opinion, the absence of a stop sign was not a cause-in-fact of the accident.
At the time of the accident, there was in full force and effect a DeRidder city ordinance mandating the placement of stop signs on each side of the railroad tracks requiring motorists on North Street to stop at the crossing. North Street was a city street. There were no stop signs in place at the time of the accident.
The reason why there were no stop signs in place at the time of the accident was *780 because on July 9, 1980, a State DOTD contractor removed them. At that time new crossbucks and posts were installed to replace the old ones, and advance warning signs were placed, for the first time, further up North Street. This work was performed as part of a statewide project under the auspices of the Louisiana Highway Safety Commission funded through the Federal Highway Administration and overseen by DOTD project engineers. The goal of the project was to install crossbucks and advance warning signs on local road and street railroad crossings; remove existing non-standard or deteriorated signs; and install crossing inventory signs. At the time of the accident, therefore, only the crossbucks and advance warning signs, along with speed signs, were present on North Street. The stop signs were not there, although the ordinance requiring them was still on the books.
The first step in the duty-risk analysis is to determine whether the absence of stop signs at the crossing was a cause-in-fact of the accident. There was expert testimony presented at trial indicating that stop signs were not necessary for this crossing. Stop signs were said to be ineffective because motorists who regularly use the crossing and only rarely encounter a train will tend to ignore the stop signs. The expert who testified that stop signs are effective, if enforced, said that most motorists will slow down or come to a "rolling stop" at a stop sign. Evidence was presented at trial that the stop signs at the crossing were enforced. But slowing down or coming to a rolling stop in the present case would not have done the job. It is a clear fact in this case that plaintiff knew the track was there. What he did not know was that a train was there. He could not see it. His driving that morning, as we shall further explain in more detail later in this opinion, shows that he began to accord the train its right of way from the moment he became aware of its presence. He began to try to stop. This maneuver was different from a slowing or a "rolling stop" effort. Thus, we cannot say that the trial court was clearly wrong in finding that under the circumstances of this case and based on the expert testimony in the record, the absence of a stop sign was not a cause-in-fact of the accident.

LIABILITY OF THE STATE
The trial judge likewise found no liability on the part of the State of Louisiana, DOTD. For the same reasons as explained above, we agree with this finding of fact. The removal of the stop signs by the State's contractor did not make the State liable, because the absence of stop signs was not a cause-in-fact of the accident.

CONTRIBUTORY NEGLIGENCE OF PLAINTIFF
The jury found that plaintiff was contributorily negligent in causing the accident. In his brief on appeal plaintiff admits fault based upon his breach of a duty to adhere to the posted speed limit of 25 mph. Although we plan to examine the issue of apportionment of fault between the parties later in this opinion, we will examine here in detail plaintiff's conduct. This will allow us to more easily and succinctly discuss apportionment of fault later.
The posted speed limit on North Street was 25 mph. An investigation by one of defendant's experts, done approximately one year after the accident, showed three 25 mph speed limit signs on North Street within three-quarters of a mile from the crossing. The closest was 470.3 feet, the second, 1,936.2 feet, and the third some distance beyond. The evidence showed that plaintiff was traveling at least 29 mph and up to 32.6 mph. The evidence established that if he had been going 25 mph when he saw or heard the train and reacted 129 feet from the tracks he would have come to a stop before reaching the tracks.
The evidence also showed that it was foggy on the morning of the accident and, importantly, the surface of North Street had a "sheen" on itit was slightly wet from the moisture-laden fog. La.R.S. 32:64 A imposes a duty on a motorist not to exceed the maximum posted speed limit. Further, the statute imposes a duty not to *781 travel at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having regard for weather conditions such as fog and the wet roadway. La.R.S. 32:58 requires a motorist to maintain reasonable and proper control of his vehicle at all times. La.R.S. 32:171 A(4) requires a motorist to stop at least 15 but not more than 50 feet from the rails when an approaching train is plainly visible and in hazardous proximity to the crossing. Crossbucks and advance warning signs are erected to warn motorists they are approaching a railroad crossing. Thus motorists should be on the lookout and be prepared to stop if necessary. All of these duties are imposed upon motorists to protect themselves as well as others.
Plaintiff admitted he was familiar with the crossing and used it to go to and from work and to his National Guard drills. He always slowed down and approached it with caution. This was confirmed by the testimony of his wife. The evidence established that on the morning of the accident plaintiff was running a little late for his National Guard drill, which was scheduled for 6:30 a.m. He was not only exceeding the posted speed limit, but apparently was traveling at a speed greater than was reasonable and prudent considering the crossing ahead and, possibly, the road conditions. Visibility was 80 to 130 yards according to a police officer. So it does not appear that plaintiff was traveling so fast that he could not have stopped within the distance he could see. The breach or breaches of these duties is the basis of plaintiff's admitted fault.

APPORTIONMENT OF FAULT
Before reviewing the jury's apportionment of fault and making our own determinations as to fault we will briefly discuss the other bases of liability asserted by plaintiff.
After reviewing the evidence and law, we find that the railroad crossing clearly did not constitute a "dangerous trap" nor did it present an unreasonable risk of harm for purposes of strict liability. The evidence also shows that the train was not speeding as alleged by plaintiff. The train was traveling less than 10 mph. The KCS speed limit was set at 10 mph through the City of DeRidder while the speed limit set by the City was 35 mph. The evidence does not establish that KCS and the City had a joint duty to see that flashing lights were installed at the crossing.
La.C.C. art. 2323 provides:
"When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss."
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985), the Louisiana Supreme Court set forth guidelines for applying the mandate of La.C.C. art. 2323, stating:
"We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, *782 whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties." (footnotes omitted)
The assessment of a certain percentage of fault to a party is a finding of fact. We must apply the manifest error standard of review to these findings as to the percentage of fault assessed to KCS and the plaintiff. We find that the jury's assessment of KCS's fault at only 45% was clearly wrong.
We determined that the jury could have found that KCS failed to sound a bell, whistle or horn as required by law. The evidence supports a finding that KCS failed to sound the warning signal until it was too late. This conduct created a substantial risk of harm to motorists. The KCS employee responsible for sounding the bell or whistle was an experienced train engineer who knew or should have known the importance of sounding the bell or whistle at least 300 yards from the crossing. A train cannot stoplike a car. If the train had been sounding its bell or whistle for 300 yards before the crossing and plaintiff heard it, he could have begun reacting, if only fractions of a second sooner, and avoided the accident. We apportion the fault of KCS at 80%.
Plaintiff admits he was at fault in causing the accident but apportions his percentage of fault at only 3.5%. Plaintiff was exceeding the posted speed limit, possibly traveling too fast for road conditions, and failed to approach the crossing as a reasonable and prudent person would. Plaintiff knew or should have known of the danger presented by such conduct. Although trains passed through the crossing only sixteen times every twenty-four hours, plaintiff's conduct created a substantial risk of harm. He apparently was in a hurry to get to his National Guard drill this appears to have been the reason for his failure to be as cautious as he usually was. However, reviewing the evidence as a whole, and considering the relative fault of all of the parties, we feel the jury's apportionment of fault to plaintiff at 40% was clearly wrong. We feel his share of the total fault should have been assessed at no more than 20%.

QUANTUM
In addressing plaintiff's assertions of error as to the jury's award of damages we quote the applicable law as set forth by the Louisiana Supreme Court in Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976):
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award.... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.... It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." (citations omitted)

SPECIAL DAMAGES
The jury awarded plaintiff $160,000 for past medical expenses, and $15,000 for future medical expenses. The trial judge refused to allow the introduction of evidence as to the value$98,095of free medical treatment afforded plaintiff by the Veteran's Administration Hospital. On appeal plaintiff cites the "collateral source rule" and argues that defendants should not benefit from the treatment afforded him by the federal government. The collateral source rule apparently does not apply in this case to the value of the VA medical care. 42 U.S.C. § 2651 provides that the United States is subrogated to any right or claim that the tort victim has against a *783 third-party tortfeasor to the extent of the reasonable value of the care and treatment furnished to the affected victim. It has been held that in such a case the tort victim may not recover damages for the value of that treatment. Cushman v. Fireman's Fund Insurance Company, 401 So.2d 477 (La.App. 2nd Cir.1981); Smith v. Foucha, 172 So.2d 318 (La.App. 4th Cir.1965), writ denied, 247 La. 678, 173 So.2d 542 (1965). Accordingly, plaintiff is not entitled to recover damages based upon the value of this free medical care. Plaintiff does not otherwise find error with the jury's award of damages for past or future medical expenses.
Plaintiff next argues that the jury erred in awarding him only $94,500 in damages for past loss of earnings. Plaintiff claims it was established that he suffered a loss of $97,574 in past earningsa difference of $3,074. It appears that the figure quoted by plaintiff represents the amount of past earnings he would have grossed. Since we feel the jury could have probably awarded plaintiff even less than $94,500 based upon an estimated net, we are unable to find an abuse of discretion in this award.
The jury awarded plaintiff $300,000 to compensate him for future loss of earnings. At the time of the accident plaintiff had been employed at Ampacet, a color concentrate manufacturing plant. The plant manager testified that during the five years plaintiff worked there he had received several promotions and eleven raises. At the time of the accident, he was a fork lift operator earning $9.70 per hour. The witness testified as to the raises plaintiff would have received in the four and a half years since the accident if he had remained a fork lift operator. At the time of trial, plaintiff would have been earning $11.75 per hour, or $24,440 per year. There was no evidence introduced regarding plaintiff's fringe benefits or National Guard pay. Plaintiff claims that the award of $300,000 was patent error. The general medical consensus was that plaintiff will never be able to gain any meaningful employment. He has a 75% functional disability. At the time of trial, he was 28 years old and, as asserted on appeal, had a work life expectancy of 37 more years based upon a retirement age of 65 years. At $24,440 for 37 years, plaintiff claims he should have been awarded $902,800 for future lost income.
Plaintiff presented no expert testimony regarding his future lost income, nor did any of the defendants. We feel that the jury abused its discretion in awarding plaintiff only $300,000 for future lost earnings. We will increase that award to $550,000 which, based upon the evidence in the record, is the lowest point which is reasonably within the discretion afforded the jury.

GENERAL DAMAGES
The jury awarded plaintiff general damages in the amount of $280,500. We find this award to be a gross abuse of the discretion afforded a jury.
Plaintiff suffered a massive head injury in the accident. A police officer at the scene recalled that what appeared to be brain matter was seeping out of plaintiff's smashed skull. The officer pushed the brain matter back into the skull and attempted to press the skull together to hold it in. Dr. William F. Foster, a neurosurgeon, treated plaintiff on the day of the accident. Commenting on the extent of his head injury, Dr. Foster said that plaintiff "was fortunate to be alive." He did not believe that the plaintiff would live. He said the head injury was a severe injury to the brain, a massive, depressed comminuted (multiple fragments), open skull fracture of the left front side of his head. Plaintiff also had a massive scalp laceration. He was comatose and remained so for days. The sac covering the brain was exposed and his brain was swollen. Due to an involuntary reflex caused by the brain injuries plaintiff's neck was thrown backwards; his arms were spastic and extended in very rigid positions turned inward; his legs and feet were also spastic with his feet turned downward. All of these conditions reflected the severity of the brain injury and that it was to the entire brain.
*784 Dr. Foster drilled into and opened up plaintiff's skull and removed two blood clots, one on each side, which were pressing on the brain. He removed bone fragments and left plaintiff's brain exposed to allow for the swelling, which continued for days. Later, during two separate operations, Dr. Foster installed two acrylic plastic plates in plaintiff's skull. After plaintiff was transferred to a rehabilitation center in Texas on November 3, 1982, Dr. Foster saw him on only two more occasions, one in April 1984 and one in July 1986. Following the initial treatment, Dr. Foster said there was little he could do to help plaintiff. Plaintiff has a severe neurological deficit which the doctor characterized as organic brain syndrome. He is a permanent quadriparetic meaning that he has weakness in all of his extremeties. The muscles in his legs are inflexible, tight, and unable to move, all which prevent him from walking normally. He walks with the aid of a walker. Dr. Foster described plaintiff's coordination as "not very good at all" and his balance as "very poor."
Dr. Foster felt that plaintiff had done extremely well considering his injuries but had reached maximum medical recovery. The doctor had never seen anyone recover to this extent following this severe a brain injury. He stated that the brain injury altered plaintiff's thought processes and memory. He has poor abstract thinking affecting his ability to reason and handle problems. But Dr. Foster felt that other than poor insight and abstract thinking, and memory problems, plaintiff had pretty good thought processes. He opined that if plaintiff fell to the ground or floor, he would need assistance to get up or have something to pull up or lean on. Because of plaintiff's limitations, physical and mental, Dr. Foster said he didn't know what possible type of job plaintiff could handle.
Dr. Robert D. Bernauer, an orthopedic surgeon, initially saw plaintiff in the first month following the accident. He took over plaintiff's treatment for another physician. His first examination revealed a compound fracture of the right tibia, a closed fracture of the left tibia, nerve injuries to both legs, and nerve damage in his right arm. A fractured/dislocated left hip was not discovered until six weeks after the accident. Dr. Bernauer stated that the damage to nerves in each leg cause plaintiff to have "footdrop" in both legs. The damaged nerves, the perineals, operate muscles which are used to raise one's feet up. Consequently, plaintiff needs to wear spring-loaded braces fitted to special shoes which automatically keep his feet up (at a 90° angle to his lower legs). The paralyzed ulnar nerve in his right arm results in plaintiff having a "clawhand" deformity. He cannot completely extend his fingers. Dr. Bernauer stated that plaintiff cannot button his shirt, or tie a shoelace and has trouble picking up things like a pencil or pen with that hand.
Dr. Bernauer also stated that plaintiff's fractured/dislocated hip was initially placed back into its socket and the fracture was set. An infection later developed requiring further treatment and eventually the hip was permanently fused solid by another physician. Since then the infection has continually flared up requiring further treatment. Dr. Bernauer said that the infection is painful but that plaintiff has a lot of physical problems now which don't really cause him pain. He felt that plaintiff could never return to work because he has "essentially" only one functional limb, his left arm. Dr. Bernauer felt plaintiff had a 75% functional disability. He can't sit normally because of the fused hip. He must sit on his right side with his left leg extended. He cannot do anything that requires him to stand for an extended period. If he falls he cannot get up without holding on to something. He must use a raised toilet seat and rails around the bath tub. Although Dr. Bernauer saw no improvement in plaintiff's physical condition in the future, he did say that an operation could give plaintiff more function in his right hand.
The operation would involve the removal and transferral of a tendon from one of his fingers. Dr. Bernauer admitted that the delay in discovering and treating the dislocated hip due to a hospital error contributed to the loss of blood supply and death of *785 bone material as well as the infection in the hip.
Dr. Robert D'Ambrosia, also an orthopedist, performed the fusion of plaintiff's hip. Because of the dislocation and delay in treatment, he said plaintiff's hip essentially died. He did a fusion because the alternative, a total hip replacement, would not be a permanent solution. There was a good chance it would loosen in eight to ten years. Then it would have to be done all over again and the second one would tend to loosen in less than eight to ten years, and so on, and so on. He said it might have gotten to the point where plaintiff's leg would have to be amputated. A successful fusion, however, would be a permanent solution. Dr. D'Ambrosia also stated that when plaintiff was admitted to the hospital in January 1983 his right arm had a ten degree flexor contracture of the elbow and spasticity in the flexor-extensor muscles around the elbow joint. His left arm had a full range of motion and good muscle strength. His left knee only flexed to forty degrees as opposed to the normal one hundred thirty-five, while his right knee only had sixty degrees of flexion.
The fusion shortened plaintiff's leg. His special shoe has to be built up. Regarding the delay in discovering the injured hip, Dr. D'Ambrosia stated that if the hip is dislocated for six hours, you have a 50% chance of the femural head dyinga vascular necrosis. But he also stated that it could be dislocated for a half-hour and develop some avascular necrosis. He also stated that in a case such as this one, involving multiple traumas, the first priority is to save the patient's life. Then you have other priorities, the lowest one being orthopedic injuries. As we have previously discussed, plaintiff had an extremely severe head injury requiring immediate medical treatment.
Dr. David S. Post, a clinical psychologist, was treating plaintiff at the time of trial. He had been treating him since May 1984 and expected to see him almost every two weeks for approximately two more years. Dr. Post stated that plaintiff was depressed and anxious. He compared his depression to a grieving process for the physical and mental abilities he lost. Plaintiff had viewed himself as capable and successful. He had a good job and a good marriage. Now all of that is gone. He can't work. He would have to depend on others if, for instance, he wanted to eat steak in a restaurant since he could not cut his meat. His wife left him after he returned from almost two years of hospitalization and rehabilitation. He feels extremely self-conscious in public. He has little social life. He feels very isolated. He is not as resilient as most people. Before the accident plaintiff was pretty well adjusted but now is shy. He must take phenobarbital to prevent seizures which he is apt to have because of his brain injuries. His speech is slow and labored. He becomes frustrated because his body cannot do what he wants it to. Dr. Post did say that plaintiff does not seem to exhibit a lot of cognitive or intellectual difficulties and that his level of mental functioning seems to be commensurate with the kind of work he was doing before the accident. He was surprised that plaintiff did not come out of this with a brain deficit and saw nothing that would prevent plaintiff from having a job using his intellectual capabilities. This last supposition, though, conflicts with the opinions of plaintiff's treating physicians, a neurologist, and two orthopedists.
Plaintiff testified at trial that he did not remember the accident. He also has other memory problems. He did recall that before the accident he used to enjoy hunting, fishing, and skating. He was a staff sergeant in the National Guard and planned to be a career Guardsman. He always wanted a family and children. He had "a very good job" at Ampacet. He has so far undergone thirteen operations and bears numerous scars from his injuries and operations. He wears braces on both legs up to his knees. He was right handed before the accident left his right hand deformed. He used to enjoy singing in a church group but since a tracheotomy was done on him following the accident, he can no longer sing and his voice is not as strong as it was. His primary activities consist of watching television and reading. He watches television *786 in a wheelchair because it is more comfortable for his hip.
He can drive his specially equipped pickup truck working the gas and brake pedals with his hands via levers. He drove a friend to N. Carolina in his truck, helping him transport some of his belongings. Five months after getting out of the hospital/rehabilitation center, plaintiff moved into his own apartment where he was living at the time of trial. Plaintiff classified different every day activities as follows: (1) Impossible kneeling, walking with his walker holding an open umbrella, writing, eating, etc. with his right hand, driving using his feet, carrying things with both hands, washing clothes, and going down stairs without a railing; (2) Extremely difficult mopping floors, picking up something from the floor, carrying a dinner plate from his kitchen to his living room, grocery shopping alone, and dating; (3) Difficult but manageabletaking a bath, sweeping, vacuuming, ironing, writing, putting away clothes, cooking, walking, shooting a gun, making up his bed, and getting in or out of his truck, (4) Easycombing his hair, brushing his teeth, folding clothes, and driving his truck; (5) Same as before reading and watching television. However, these are not really the same as before because he cannot sit comfortably. To bathe himself he sits on a bench and uses a hand held shower. He hooks a wash rag onto a stick to wash himself. When getting dressed he uses sticks to pull on his socks and pants. He tries to wear shirts which snap up the front rather than button because it is "real, real hard" to button up shirts. He also eats with a spoon.
Plaintiff's father-in-law testified that plaintiff and his daughter were "very much in love before the accident." He stated that plaintiff is not the same person he was before the accident and that his temper flares now. Major Robert J. Moore, the Commander of the Louisiana Army National Guard Unit at Leesville, testified that plaintiff had the reputation of having the finest 81 mm mortar section in the 3rd Battalion. Plaintiff was an instructor/trainer not only for the Leesville Unit but for the whole 3rd Battalion.
Viewing the evidence in a light most favorable to defendant and considering the extent of plaintiff's injuries, his past and future physical pain and suffering, his past and future mental anguish, disability, disfigurement, and the consequential effect on his enjoyment of life, we feel the jury's award of $280,500 in general damages was a gross abuse of discretion. Having made this finding we are bound to raise the award only to the lowest amount which would have reasonably been within the discretion of the jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Alexander v. Leger, supra. Both plaintiff and defendant cite cases to assist us in our review and proper determination of an award of general damages. However, it is not necessary for us to recite a litany of previous awards to justify our modified award for general damages. As the Supreme Court wisely stated in Coco v. Winston Industries, Inc., supra, "[c]ourts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal." See also Alexander v. Leger, supra.
Plaintiff sets a minimum award for general damages at $2,754,100. We find that amount exceeds the lowest award which the jury could have reasonably awarded. Considering the extent of plaintiff's injuries, his age, and his imprisonment for the rest of his life inside a body which will never function at more than 25% of its former capacity, we find that the lowest amount which in its discretion the jury could have reasonably awarded plaintiff is $2,000,000.

MISCELLANEOUS ASSIGNMENTS OF ERROR
Plaintiff raised numerous assignments of error concerning the trial court's refusal to give certain requested jury charges. We have examined the jury instructions and we find that, as a whole, they adequately charged the jury as to the applicable law.
*787 Plaintiff also raised several assignments of error as to the trial court's evidentiary rulings. We addressed and disposed of one concerning the presentation of evidence to support recovery of damages for the value of medical services rendered by the VA. As to the others, we have examined the issues and evidence profferred by plaintiff. We did not consider the proffered evidence in arriving at our decision but it would not have affected our findings and final result. KCS raised two assignments of error as to evidentiary rulings by the trial court. Those assignments concerned (1) the presentation of evidence relating to prior accidents at the crossing without requiring plaintiff to lay a proper foundation and without allowing it to rebut the evidence; and (2) the introduction of evidence concerning the City's requests of KCS to install flashing signal lights at the crossing. We did not rely on the accidents or the requests for signal lights in resolving the question of KCS's duties, violations thereof, or in resolving the issue of apportionment of fault, or quantum.
For the reasons assigned, we amend the judgment of the trial court, and as amended, recast to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that judgment be and hereby is rendered in favor of plaintiff, RICHARD E. JOHNSON, JR., and against defendant, KANSAS CITY SOUTHERN RAILWAY COMPANY, in the principal sum of TWO MILLION, TWO HUNDRED FIFTY-FIVE THOUSAND, SIX HUNDRED & NO/100 ($2,255,600.00) DOLLARS, together with legal interest from date of judicial demand until paid, which sum represents the total amount of damages $2,819,500.00 reduced by the twenty percent of fault apportioned to the plaintiff.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of intervenor, LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, and against plaintiff, RICHARD E. JOHNSON, JR. and defendant KANSAS CITY SOUTHERN RAILWAY COMPANY, in the principal amount of ONE HUNDRED NINETEEN THOUSAND, SIX HUNDRED FIFTY-FOUR & NO/100 ($119,654.00) DOLLARS, together with legal interest thereon from date of judicial demand until paid, which sum represents the total amount of intervenor's claim of $149,567.52 reduced by the twenty percent of fault apportioned to plaintiff. The said amount of $119,654.00 is to be paid to intervenor in preference and priority out of the $2,255,600.00 awarded to plaintiff RICHARD E. JOHNSON, JR. on the main demand.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the fees for the expert witnesses be fixed as follows and taxed as costs of court:

Dr. William F. Foster $150.00
Dr. R. Dale Bernauer 150.00
Dr. Robert D'Ambrosia 100.00
Dr. David Post 150.00
Dr. Olin Dart 250.00
Edward Harrelson 250.00
Duane T. Evans 250.00
Virginia Tipton 100.00

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the costs of court at both the district and appellate levels are assessed eighty percent to defendant KANSAS CITY SOUTHERN RAILWAY COMPANY, and twenty percent to plaintiff RICHARD E. JOHNSON, JR.
AMENDED, AND RECAST AS AMENDED.