413 So.2d 674 (1982)
Susie Mae BRADLEY, Individually and as Administrator of the Estate of her Minor Children; Theresa Diane Bradley, Lashanna Deniese Bradley, Linda Gail Bradley, and John W. Bradley, III, Plaintiff-Appellant,
v.
Aurila F. HUNTER, et al., Defendants-Appellees.
No. 8701.
Court of Appeal of Louisiana, Third Circuit.
April 14, 1982.
Writ Denied June 11, 1982.
*675 Brittain & Williams, R. Stuart Wright, Natchitoches, for plaintiff-appellant.
Andrew S. Vallien, Natchitoches, for defendants-appellees.
Before GUIDRY, CUTRER and STOKER, JJ.
CUTRER, Judge.
This is a wrongful death and survival suit arising out of the fatal shooting of J. W. Bradley.
The shooting death of J. W. Bradley (J. W.) took place at approximately 9:00 P.M., on May 14, 1980, in Campti, Louisiana. J. W. was shot by defendant, Aurila F. Hunter (Aurila), in front of the "Honeydripper Cafe" which is operated by Aurila and her mother, Ora Edwards (Ora), also named as a defendant in this suit.
Plaintiff, Susie Mae Bradley, "wife"[1] of decedent, filed this suit on her own behalf and that of her four children seeking damages for the death of her "husband," and the loss of the children's father. J. W. is survived by four children, the last of which was born posthumously, named: Theresa Diane Bradley, Lashanna Deniese Bradley, Linda Gail Bradley, and John W. Bradley, III.
Counsel for defendants filed a dilatory exception of lack of procedural capacity which challenged the right of the children to sue as their mother had not been qualified as their natural tutrix and also a peremptory exception of no cause of action which challenged Susie Mae Darby's (Bradley) right as a concubine to sue individually for the wrongful death of J. W. The trial judge overruled the dilatory exception as it had been filed subsequent to defendant's answer; he sustained the peremptory exception as plaintiff admitted that she was not legally married to J. W. thus stating no cause of action for the wrongful death of J. W. Plaintiff's suit, on behalf of J. W.'s four minor children, remains.
This is a non-jury trial and after plaintiff had presented her evidence, the trial court granted defendants' motion for a directed verdict,[2] dismissing plaintiff's suit. Plaintiff appeals. We affirm.
The substantial issue on appeal is whether defendant, Aurila, was justified in shooting J. W. in self-defense.
Before evaluating the facts and law, to make a determination of the issue before us, we pause to observe that the motion to dismiss in this non-jury case was filed and granted at the close of plaintiff's presentation of evidence. This proceeding is authorized by LSA-C.C.P. art. 1810(B), which reads as follows:

"B. In an action tried by the court without a jury, after the plaintiff has *676 completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence."

When a motion for a dismissal is filed under this provision, the proper standard to be applied by the trial court, in ruling upon the motion, differs from the standard to be used when a motion for a directed verdict is filed in a jury trial.[3] In a non-jury trial, the trial judge, upon a motion under art. 1810(B) for a judgment of dismissal (upon completion of the plaintiff's case), must weigh and evaluate all of the evidence presented up to that point in the trial and must grant dismissal if the plaintiff has not established proof by a preponderance of the evidence. Semien v. PPG Industries, Inc., 413 So.2d 956 (La.App. 3rd Cir. 1982); Murray v. Haspel-Kansas Investments, 395 So.2d 453 (La.App. 4th Cir. 1981).

FACTS
Aurila testified that J. W., a twenty-eight-year-old man, came into the "Honeydripper" around 9:00 to 9:30 P.M., May 14, 1980, wanting to purchase a soft drink ("coke"). Aurila is sixty-five years old, not in particularly good health (she is under a doctor's care), unmarried and lives with her eighty-two-year-old mother, Ora, who owns the cafe. Ora,[4] a widow, also in poor health and under a doctor's care, works in the cafe with Aurila. No one else is employed in the restaurant. The cafe sells food, a little beer and no hard liquor.
Aurila testified at trial that she has had trouble with J. W. on at least two prior occasions and told him not to come into the cafe. That night J. W. entered wanting his "coke" but Aurila refused to serve him. Ora offered J. W. the "coke" but he refused. J. W. began to threaten and curse Aurila who restrained herself despite his cursing the two old women. She told him to go home. He did not leave until he had finished cursing and threatening Aurila.
A Smith & Wesson Model 10 .38 caliber revolver was kept under the counter near the cash register. While J. W. remained in the store Aurila did not pick up the gun but she did so after he had left. J. W. walked out of the cafe cursing and threatening the women. After he had left, Ora went outside to see if J. W. had gone. Aurila went out onto the porch to see about her mother. As she stood on the porch, Aurila saw J. W. coming toward her, walking rapidly, as she said he had a tendency to do, with his arms flailing away, fists clenched, and cursing and threatening her. She then pulled the gun from her blouse pocket and told J. W. not to come to the cafe. She fired one warning shot (probably two, as three shots were fired but only one hit J. W.), and fired again whenever J. W. kept coming, walking fast, cursing and threatening Aurila. She fired from about thirty feet away; the bullet struck J. W. in the head, killing him.
Aurila testified that J. W. had threatened her two weeks before the incident in question, after she had refused to sell him some beer. She stated that he threatened to "get her" should she go outside to the mailbox. From that time until the incident in question, Aurila stated that she did not go to the mailbox for fear of J. W. She stated that she had known J. W. since he was a small child and knew of his reputation in the community. Aurila stated that she knew J. W. had previously shot a man in the back with a shotgun. Also, she saw him *677 strike another person across the back with a crutch for refusing him a drink of wine. J. W.'s "wife" and aunt both stated that he had spent considerable periods of time in jail. Plaintiff stated that since they began living together in 1972 or 1973, he had spent over one-half of the time in prison. Deputy Dowden, an investigating officer, stated that he had known the decedent due to having received calls about him and his prior arrests. He further testified that J. W. was very belligerent toward the law enforcement officers; he had made threats to them and felt he was capable of carrying them out. His testimony in this regard is as follows:
"Q. Where did these occur?
"A. These were, as I said, in the past throughout my career and at times, I've picked up the subject.
"Q. Have you ever picked him up in the Campti area?
"A. Yes, sir.
"Q. Where in Campti?
"A. It's been quite a few occasions. It would be hard to say. Mostly in the area around the Campti Short Stop.
"Q. And was he cooperative with you? Do you recall his attitude?
"A. Very few occasions was he cooperative.
"Q. Okay. Now, how was he uncooperative?
"A. He was usually very belligerent towards officers.
"Q. Did he ever threaten you?
"A. Yes, sir.
"Q. Okay. How did he threaten you?
"A. He made numerous threats throughout his conversation as to what he would do.
"Q. Do you feel that he was capable of carrying out these threats if he had the chance to do so?
"A. I would say so, in my opinion, yes, sir."
As can be gleaned from the testimony presented by plaintiff, J. W. was considered to be less than a model citizen. He was known to have a quick temper and violent propensities. He was a young man of twenty-eight who had threatened, cursed and intimidated two old women aged sixty-five and eighty-two. At the time of the shooting J. W. was walking rapidly toward the two women, who were standing on their porch. He was cursing and throwing his arms about in a threatening manner. A warning both verbally and by a discharge of the gun failed to dissuade J. W. from his continued harassment of Aurila and Ora. Aurila fired again in fear of her and her mother's safety, killing J. W. Aurila stated that she was really fearful for her and her mother's safety at the time of the incident.
John Kirkendoll testified that he was about fifty yards away from the scene at the time of the shooting. He stated that at the time of the shooting, J. W. was standing in the middle of the highway. This testimony was not accepted by the trial court. Kirkendoll stated that he did not "run with" J. W. but was an "associate" of his. Deputy Dowden stated that Kirkendoll had been drinking at the time of the incident. The trial court committed no error in rejecting this testimony.
The law applicable to a case of this kind is clear and well settled. In the case of Roberts v. American Employers Ins. Co., Boston, Mass., 221 So.2d 550 (La.App. 3rd Cir. 1969), this court stated as follows:

"The privilege of self-defense in tort actions is now well recognized by our jurisprudence. Where a person reasonably believes he is threatened with bodily harm, he may use whatever force appears to be reasonably necessary to protect against the threatened injury.... Of course, each case depends on its own facts, such as, for instance, the relative size, age and strength of the parties, their reputations for violence, who was the aggressor, the degree of physical harm reasonably feared and the presence or absence of weapons." (Citations omitted.)
In summary, the trial judge found decedent, J. W. Bradley, to be a man "of a pugnacious and aggressive nature, with a long record, ever since he had been an adult, and perhaps even before, a long record *678 of violence, which brought him into contact with the law." The trial judge pointed out that J. W. had spent about four of the last nine years in prison. J. W. had been warned on prior occasions to stay out of the "Honeydripper Cafe," yet he refused; he entered the cafe that fateful night cursing and threatening the two elderly women who operated it. He refused to leave, despite their request, until he had sufficiently cursed them. Aurila took the gun with her when she went onto the porch to see about her mother who had gone out to see if J. W. had left.
"Then, with the passage of some period of time, here he comes back again, rushing at her with his fists balled up and walking at her and threatening her, while she stood on her own porch. She warned him. Her testimony was that she told him, `Go away.' She fired a warning shot. Even Mr. Kirkendoll, who was cold sober, according to his testimony, testified that the first shot did not hit Bradley. And his testimony was that Bradley was not hit and said something to her, or something of that nature. But, this didn't slow him down. He kept on coming at her. The evidence, as a whole, indicates to me that the decedent made Mrs. Hunter shoot him. And the finding of the Court is that this was a case of justifiable self-defense and the motion for the directed verdict is granted in favor of the defendant. The case is dismissed."
From our perusal of the record, we conclude that the trial court was correct in finding that Aurila acted in self-defense.
Plaintiff cites the case of Brasseaux v. Girouard, 269 So.2d 590 (La.App. 3rd Cir. 1972), writ den., 271 So.2d 262 (La.1973), as a basis for the contention that Aurila did not shoot in self-defense. We disagree. In Brasseaux, self-defense was disallowed. It is, however, clearly distinguishable from the case at hand.
In Brasseaux, the plaintiff and defendant were involved in a boundary dispute. On the day in question, during daylight hours, plaintiff and defendant each drove their vehicles to an open pasture. A fence separated the parties. Accompanying defendant in his pickup truck were four men; defendant's brother-in-law, a son-in-law and two nephews. Brasseaux was accompanied by one person who remained in the vehicle during the incident. Defendant got out of his truck with a shotgun and stood behind his truck as Brasseaux walked from his vehicle toward the fence. When Brasseaux was near the fence, defendant shot him while he was thirty-five feet away and had made no effort to cross the fence. The court observed as follows:
"... Girouard's position behind the truck near four relatives and armed with an automatic shotgun was ample protection from Brasseaux who was at least 35 feet away, alone and not making an attempt to cross the fence. To the argument that Girouard feared that Brasseaux's hidden hand concealed a weapon, we state that Girouard had the drop on Brasseaux and could have readily ascertained that Brasseaux was unarmed...."
The court concluded that:
"... We do not feel that under the circumstances presented here a reasonable person would or could have believed in good faith that it was necessary for him to shoot plaintiff in self defense."
In the case at hand, Aurila and her mother did not have the protection of four men, the fence or truck. Under the circumstances of this case, Aurila, as a reasonable person, could have believed in good faith that it was necessary for her to shoot J. W. to prevent bodily harm to her and/or her mother.
The trial judge, after hearing plaintiff's testimony and proof, ruled that she had not proved her case by a preponderance of the evidence. As a factual determination we cannot reverse the trial court's ruling absent manifest error or the decision being clearly wrong. No such error appears in this record.
For the reasons set forth, the judgment of the trial court is affirmed. The plaintiff-appellant is to pay costs of this appeal.
AFFIRMED.
NOTES
[1] Susie Mae Bradley was not legally married to J. W. Bradley during their relationship which was one of concubinage. However, all children born of that relationship are the natural children of J. W. Bradley and Susie Mae Darby (Bradley).
[2] This motion should be referred to as a motion to dismiss.
[3] In deciding a motion for a directed verdict and dismissal in a jury trial, the trial court must make a determination by applying the rule of whether the plaintiff's evidence is so insubstantial that reasonable men could not have arrived at a verdict contrary to that entered by the trial court. Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir. 1979); LSA-C. C.P. art. 1810(A).
[4] Ora did not testify at trial due to bad health.