611 So.2d 825 (1992)
G.B.M., INC., Plaintiff-Appellant,
v.
JUNA CORPORATION, et al., Defendants-Appellees.
No. 91-1022.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1992.
*826 Strain, Dennis, Ellis, Mayhall & Bates, Thomas C. McKowen, IV, Frederick W. Ellis, Baton Rouge, for plaintiff-appellant.
Young, Richaud, Theard & Myers, George J. Richard, Robert J. Young, New Orleans, for defendant-Koch Oil.
Robert L. Cabes, Lafayette, for defendant Juna/Headington Oil.
Edwards, Stefanski, Barousse, Cunningham, Stefanski & Zaunbrecher, Russell K. Zaunbrecher, James M. Cunningham, Crowley, for Federal Land Bank.
Steeg & O'Connor, Randy Opotowsky, New Orleans, Liskow & Lewis, Patrick W. Gray, Lafayette, for Conoco.
Before DOUCET and KNOLL, JJ., and MARCANTEL,[*] J. Pro Tem.
KNOLL, Judge.
This appeal concerns the propriety of the trial court's granting of defendants' motions for involuntary dismissal of plaintiff's claims pursuant to LSA-C.C.P. Art. 1672(B).
The case was posed to the trial court via G.B.M., Inc.'s (G.B.M.) petition for a declaratory judgment, injunction, damages, and an accounting. G.B.M. was seeking a declaratory judgment decreeing that the oil, gas and mineral lease executed on April 10, 1984, by Will T. Haristy to Prime Energy Group, Inc. (Prime) survived a foreclosure by the Federal Land Bank of Jackson (FLB) on a mortgage recorded on August 26, 1981.
The trial court denied plaintiff's motion for a new trial. G.B.M. devolutively appealed, and defendants, REW Enterprises, Inc. (REW), Headington Oil Company (Headington), and, Juna Corporation (Juna), answered the appeal, seeking damages for a frivolous appeal.
G.B.M. and the defendants' answer to the appeal present the following issues for our determination: 1) whether the defendants' motions for involuntary dismissal were timely; 2) whether the trial court erroneously granted the defendants' motions for involuntary dismissal; 3) whether the trial court erred in concluding that operations from the Haristys' well did not maintain Prime's lease; and, 4) whether this appeal is frivolous, entitling defendants to damages.

FACTS
The plaintiff, G.B.M., and defendants, Juna, Headington, and REW, stipulated the following facts:

*827 "1. Will Haristy, Jr. and his wife, Gloria Thibodeaux ("Haristy") owned several tracts of land in the Bayou Mallet area of Acadia Parish, including a 35 acre tract acquired in 1974 from the Richard family, which tract was contiguous to other tracts making up a total of 168 acres, more or less.
2. In June of 1981, Haristy leased the entire 168 acres to Flynn Energy. This instrument is sometimes referred to as the "Flynn Lease." This lease was negotiated for Flynn by Michael F. Miley ("Miley") and Miley received an overriding royalty in one of his companies, Michael F. Miley Oil Properties.
3. In August of 1981 Haristy mortgaged the entire 168 acres to the Federal Land Bank ("FLB").
4. Flynn elected not to maintain the Lease, and assigned it to Michael F. Miley Oil Properties and Condis, Inc., who in turn sold portions of the working interest to TXO Production. Various other parties acquired interests in the lease and a well was drilled by TXO for its account and its partners. This well is generally referred to as the "Haristy Well" or the "TXO Well" in the testimony.
5. In December of 1983, the Haristy Well ceased producing and TXO and its partners elected not to attempt reworking or other operation to maintain the lease. After negotiation with Haristy, an agreement was reached to release the lease and convey the well, including the surface and downhole equipment, to Haristy. Mr. Haristy is a graduate petroleum engineer and had, in fact, served as the "pumper" for TXO on the Haristy Well. Apparently the deal resulted from his claims as to surface restoration provisions in the lease.
6. TXO and its partners, including Miley, executed a Release and Bill of Sale which was recorded on April 12, 1984. As a result of these acts, Haristy was the owner of the Haristy Well and all related equipment, and had the exclusive right to operate the well and attempt to restore production.
7. In 1984, Haristy was in default under the FLB Mortgage, which required annual payments of approximately $33,000.00 and such default had existed since the previous May. Miley secured a lease to Prime Energy Group, Inc. from Haristy, giving him a 30-day draft for $33,694.00 which Haristy endorsed over to FLB on April 10, 1984, along with the Haristys' personal check for $1,255.00, to pay the note that had been due since May of 1983.
8. Haristy executed a lease to Prime, another company of which Miley was principal owner, effective April 10, 1984, providing for a ¼th royalty, a three year primary term and a rental obligation of $33,694.00 per year if the lease were not otherwise maintained. This instrument is generally referred to as the "Prime Lease." It was recorded in July of 1984. Subsequently, Prime restored production from the Haristy well.
9. After December 18, 1984, Prime did not make any rental payments under the lease, including specifically the rental payment on April 10, 1985. Therefore, unless the operation of the Haristy Well and royalty payments by Koch Oil Company to the Haristys and the Federal Land Bank maintained the Prime Lease, it expired on April 10, 1985, six months before the Sheriff Sale to FLB. Prime made an attempt to negotiate a "farmout" of the lease to JUNA. This negotiation did not result in any agreements between Prime and JUNA.
10. FLB had filed its foreclosure suit in Acadia Parish on December 17, 1984. Haristy stayed those proceedings by the filing of a Chapter *828 11 Petition on January 16, 1985. The bankruptcy proceedings reveal that Prime made an appearance in the bankruptcy, filing a proof of claim and lien affidavit to recover costs incurred on Haristy's behalf in the operation of the Haristy Well. Anyone reviewing the bankruptcy record would be made aware of a threatened foreclosure, but not the sale itself. Notice of Seizure was filed in December of 1984.
11. Without notice to Prime, FLB eventually secured an order lifting the automatic stay, and prosecuted its foreclosure to conclusion. A new Notice of Seizure was filed of record September 5, 1985 and a Sheriff Sale was held on October 17, 1985, at which FLB was the successful bidder for a price of $223,354.00.
12. Prime's address, or that of its counsel, was known or readily available to FLB, but no notice of the foreclosure seizure and sale was sent to Prime by FLB.
13. At the time of the Sheriff Sale, Prime was in the process of being dissolved, the initial dissolution proceedings having been begun in June of 1985.
14. On November 4, 1985 FLB executed a lease to JUNA, which sold interests to various parties, including Headington. The other working interest partners are not parties hereto. Headington, JUNA and those parties drilled the JUNA Corp. Federal Land Bank # 1 Well ("FLB Well") on the same 35-acre tract as the existing Haristy Well. The FLB Well was completed as a producer and has continuously produced. The well is produced under a Unit established by the Office of Conservation of the State of Louisiana in Order 219-A-7.
15. After the foreclosure, after the lease to JUNA and after the FLB Well had been drilled, G.B.M. acquired from Prime such rights as Prime might then own in the Haristy Well and the Prime Lease. This conveyance was accomplished by execution of an Assignment and Bill of Sale dated February 14, 1986, recorded May 21, 1986.
16. G.B.M. thereafter filed this suit, in October of 1986, naming as defendants FLB, JUNA, Headington, and the former and present oil purchasers (Koch and Conoco). Koch has deposited the funds which it was holding into the registry of the Court and was dismissed from the suit. FLB, which was placed into receivership by virtue of an order of the Farm Credit Administration dated May 20, 1988, filed a petition for removal to this Court after the Receiver was added as a party to the suit in June of 1988. The basis of the removal was federal question jurisdiction. At the time of the anticipated trial in federal court, a question as to jurisdiction arose. The court on its own motion issued an order remanding the case to this court."
In addition to these stipulated facts, Will and Gloria Haristy (husband and wife) testified. Will Haristy is the designated agent of G.B.M. Their testimonies establish that Mr. Michael Miley, who is the principal owner of Prime Energy Group, executed a lease with the Haristys in April of 1984. The Haristy well is not mentioned in the Prime lease. When the lease was executed, the Haristy well was not producing. The Haristys and Miley had a separate unrecorded side agreement about getting the Haristy well back into production. Miley did get the Haristy well producing. However, Will Haristy and Miley apparently had some disagreement and Miley assigned whatever interest he had in the well back to the Haristys in December of 1984. Only the Haristys received the proceeds from the Haristy well after December of 1984.
In denying GBM's motion for a new trial, the trial court stated:
"The mineral lease to Prime Energy did not, in fact, exist at the time of the *829 foreclosure proceedings and the Sheriff's sale conducted on the immovable property located in Acadia Parish at the request of Federal Land Bank in October of 1985. Prior to that time, Prime Energy had transferred to Will Haristy, Jr. its interest in the well in December of 1984. Following that transfer, Prime Energy no longer had any interest in the Will Haristy, Jr. No. 1 Well. Since no operations were conducted on the lease premises and the lease premises were not pooled into any production or unitization agreement, and no further payments were made by Prime Energy, the lease expired by its own terms prior to the Sheriff's sale in October of 1985 such that the defendants did not deny plaintiff's due process by their failure to give direct notice to Prime Energy of the impending Sheriff's sale under the applicable state and federal constitutional law...."
For the following reasons we affirm the trial court and grant damages for a frivolous appeal.

INVOLUNTARY DISMISSAL
Initially, G.B.M. asserts that the trial court erred in granting the involuntary dismissal because the defendant, having introduced documentary evidence at the beginning of trial, waived their right to seek an involuntary dismissal.
Defendants rely on LSA-C.C.P. Art. 1672(B) for an involuntary dismissal of plaintiff's case, which provides:
"In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence."
The record clearly shows that before ruling on the motion, the learned trial court stated:
"At this time for the record, the Court has not considered any of the documents which were presented by the defendants in arriving at the conclusion today."
It is clear that the trial court only considered the plaintiff's evidence; therefore, we fail to see how the defendants' documentary evidence introduced immediately prior to trial prejudiced the plaintiff. Defendants' documentary evidence lay dormant. Plaintiff did not use the defendants' documentary evidence nor did the trial court consider it. Under these circumstances, we find defendants' did not waive their right to move for an involuntary dismissal.
Now we address whether G.B.M. proved its case by a preponderance of evidence. When a motion for dismissal at the close of plaintiff's evidence is made, such as in the case sub judice, the trial court should apply the preponderance of the evidence standard in weighing and evaluating the evidence. Mott v. Babin Motors, Inc., 451 So.2d 632, 637 (La.App. 3rd Cir.1984); Bradley v. Hunter, 413 So.2d 674, 676 n. 3 (La.App. 3rd Cir.1982), writ denied, 415 So.2d 952 (La.1982). Proof by a preponderance of the evidence means that, taking the evidence as a whole, such proof shows that a fact sought to be proved is more probable than not. Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366, 369 (La.App. 2nd Cir.1988). When a party fails to carry his burden of proof, there is no necessity for the opposing party to rebut insufficient evidence. Harvill v. Casey, 461 So.2d 373 (La.App. 2nd Cir.1984), writ denied, 464 So.2d 318 (La.1985).
G.B.M. has utterly failed to prove by a preponderance of evidence that the lease the Haristys entered into with Prime Energy in April of 1984 was maintained by the operation of the Haristy well. Plaintiff's evidence only shows the following: that the Haristys owned the well; it was not producing when the lease was entered into with Prime Energy; the Haristys entered into some side agreement with Miley if he got the well producing; Miley got the well *830 producing; and, in December of 1984 Prime relinquished all interest in the Haristy's well; Prime Energy did nothing with the lease; and in October of 1985 the lease with Prime Energy expired by its own terms. The evidence tends to show that the Haristys dealt with Miley concerning the Haristy well separate and apart from the Prime lease. However the stipulation of facts, # 8, states: "Subsequently, Prime restored production from the Haristy well." The record clearly shows through the testimony of Will Haristy that Prime relinquished the Haristy well to Will Haristy:
"Q. When did the ownership interest in the well change between you and Prime?
A. Mike [Miley] didn't want to spend anymore money on the well and I wanted to, so it changed when he decided to assign it back to me." (Volume 5, page 950 of record.)
The assignment of the Haristy well from Prime to Haristy was in December of 1984 according to Will Haristy's own testimony:
"Q. After December of 1984, did you continue to operate the well?
A. We had a change of ownership at the Conservation Department, which changed thethe change of operator was filed. A week later, on 12/21/84, a rig was on location, gas lift wellgas lift values were running the well, compressor rented and the well put on production.
Q. Okay. You became the operator of the Will Haristy Well at that time?
A. Yes, sir.
Q. Okay. What do you do to operate a well like this?
A. I was operator and pumper...."
Gloria Haristy's testimony further corroborates that she and her husband, Will, owned the Haristy well to the exclusion of Prime after December of 1984:
"Q. Okay. And during this time, this is 1985, it's your testimony then that you and your husband owned the well in its entirely [sic], you paid the all the expenses, you got all the revenue?
A. Tell me that again.
* * * * * *
Q. So aside from that royalty interest, you got all the money, you paid all the expenses?
A. In '85?
Q. '85, yes, ma'am. This is the year for which you filed this return.
A. I'll ask you a question. Was that when Mike Mileywas he our partner then, or he had signed it back in '84?
* * * * * *
Q. Okay. And it's my understanding then that you and your husband were the only parties who got any money out of the well other than the Richard family [royalty owners] and, of course, the government. That you paid all the expenses, you and your husband went out and took care of the well; is that correct?
A. I think so.
Q. Did Mr. Miley, to your knowledge, get any of the income from this or any of his companies?
A. Oh, no." (Volume 5, pp. 977-979 of record.)
We find this evidence shows that Prime released all rights to the Haristy well to the Haristys in December of 1984. The testimonies of the Haristys clearly show that they owned the well to the exclusion of Prime after December of 1984. The evidence is equally clear that Prime made no further production under the lease and did not make any rental payments under the lease after December of 1984. (stipulation of facts # 9). Plaintiff admits that "unless the operation of the Haristy Well and royalty payments by Koch Oil Company to the Haristys and the Federal Land Bank maintained the Prime Lease, it expired on April 10, 1985, six months before the Sheriff Sale to FLB." (stipulation of facts #9).
Based on plaintiff's evidence, we find plaintiff's argument completely untenable. Since Prime assigned its interest in the Haristy well to the Haristys in December *831 of 1984, Prime gave up whatever interest it had in the lease at that time to its lessors, the Haristys. Prime's interest became the Haristys' interest. After the assignment, Prime's interest in the lease was not maintained and it expired on April 10, 1985. Plaintiff offered no evidence to show how the Haristys' ownership and operation of their own well maintained the Prime lease. Plaintiff argues that because the Prime lease did not mention the Haristy well, that production from the Haristy well maintained the Prime lease. This argument flies in the face of plaintiff's own evidence. Furthermore, to say that there was a contract of lease on the Haristy well because it was not mentioned and never a meeting of the minds concerning this well is to say that silence creates a contract. This argument is frivolous and ignores the body of civil law obligations that must be met before a contract is made.
Accordingly, we find the learned trial court properly granted defendants' motion for an involuntary dismissal of plaintiff's case.

DAMAGES FOR FRIVOLOUS APPEAL
The defendants requested damages for a frivolous appeal in their answer to G.B.M.'s appeal. Under LSA-C.C.P. Art. 2164, we may award damages for frivolous appeals. We find damages are warranted because appellant failed to raise a serious legal question. Billeaud v. Ass'n of Retarded Citizens, 569 So.2d 1020 (La.App. 3rd Cir.1990). Although the facts of the case were complex, the answer to the pivotal issue of whether operations or production from the landowners' well would maintain the lessee's lease was elementary and frivolous. Because this proceeding, which originated more than 6 years ago, was unnecessarily lengthy and protracted, we award damages to each defendant-appellee in the sum of $2,500.
For the foregoing reasons, the judgment of the trial court is affirmed and G.B.M., Inc. is hereby ordered to pay unto each defendant-appellee the sum of $2,500 as damages for a frivolous appeal. Costs of this appeal are assessed to G.B.M., Inc.
AFFIRMED.
NOTES
[*] Judge Bernard N. Marcantel participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.