# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 03-668

JESSICA BROUSSARD, as natural tutrix of her minor child,
LANNAH D. BROUSSARD

VERSUS

PREMIERE, INC., TODD RICHARD and
RELIANCE INSURANCE COMPANY

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 74,915
HONORABLE J. BYRON HEBERT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

### NED E. DOUCET, JR.
### CHIEF JUDGE
\*\*\*\*\*\*\*\*\*\*

Court composed of Ned E. Doucet, Jr., Chief Judge, Sylvia R. Cooks, and Michael G. Sullivan, Judges.

**AFFIRMED.**

Bret C. Beyer, Sr.
Hill & Beyer
P. O. Box 53006
Lafayette, LA 70505-3006
Counsel for Plaintiffs/Appellants:
 Jessica and Lannah Broussard

Roch P. Poelman
Lemle & Kelleher, L.L.P.
601 Poydras St., 21st Floor
New Orleans, LA 70130-6097
Counsel for Defendants/Appellees:
 Premiere, Inc. , Todd Richard and
 Louisiana Insurance Guaranty Association
DOUCET, Chief Judge.

Plaintiffs Jessica and Lannah D. Broussard, appeal a judgment of the trial court dismissing their suit for damages against Defendants, Premiere, Inc., Todd Richard and the Louisiana Insurance Guaranty Association (LIGA)(successor to the now defunct Reliance Insurance Company), pursuant to the provisions of La.R.S. 22:1386. We affirm the judgment of the trial court.

**FACTS**

On November 19, 1998, Plaintiff, Lannah Broussard, who was 14 years old at the time, was a guest passenger in the rear seat of a 1997 Mitsubishi Mirage being operated by her friend, Casey Amy. The Mitsubishi was owned by Casey's father, Richard Amy, and insured by Louisiana Farm Bureau Insurance Company (Farm Bureau). The Amy vehicle, which was stopped waiting for traffic in front of it to clear, was struck from the rear by a 1995 Chevrolet Suburban owned by Premiere, Inc. and being driven by its employee, Todd Richard. The suburban was insured by Reliance Insurance Company (Reliance).

Upon impact, Lannah, who testified that she was not wearing a seat belt at the time of the accident, was thrown forward, sustaining a contusion to her face when it stuck the rear of the front seat. She stated that immediately after the impact she experienced pain in her jaw, neck and back.

Following the accident Lannah received treatment by a number of medical professionals: Dr. James Pearce, a D.D.S., who treated Lannah for temporomandibular (TMJ) disorder; Dr. Clifton W. Shepherd, Jr., an orthopaedic surgeon; Dr. Leo deAlvare, a neurologist; Dr. Angela Mayeux, another orthopaedic surgeon; and Dr. Ladislas Lazaro, IV, a rheumatologist. Lannah was also seen by Dr. Robert D. Franklin, who specializes in physical medicine and rehabilitation and Dr. Paul D. Ware, a specialist in psychiatry and neurology who devotes much of his practice to

1

the investigation and treatment of fibromyalgia. Lannah also briefly saw two psychologists, a chiropractor and underwent two courses of physical therapy.

Lannah was involved in a second, serious accident on January 28, 2000 (the pick-up truck in which she was riding with seven other teenagers flipped over). This accident resulted in a broken nose which required surgical repair by Dr. Barrett Alldredge. Subsequently, the sole father-figure in her life, Michael Deville, was killed in an accident on June 14, 2000. There is no doubt that not all of her treatment was due to her accident of November 19, 1998, i.e., she was not seen by any mental health professional until after Mr. Deville was killed.

As will be discussed below, the only real issue at the trial level was did Plaintiffs' damages exceed $105,000.00. The trial judge found they did not, and dismissed Plaintiffs' suit. Plaintiffs appeal.

**LAW AND DISCUSSION**

In the rear-end accident at issue, Todd Richard, the driver of the follow vehicle was found to be at fault. Mr. Richard, who was employed by Premiere, Inc., was driving a company vehicle, and was found to be in the course and scope of his employment at the time of the accident. Premiere's automobile liability carrier was Reliance Insurance Company (Reliance). The car in which Lannah Broussard was a guest passenger was insured by Louisiana Farm Bureau Insurance Company (Farm Bureau). The Farm Bureau policy provided $100,000/$300,000 in both liability and underinsured/uninsured (UM) coverage, as well as $5,000.00 in medical payments coverage. Sometime after the accident, Reliance went into bankruptcy and LIGA was made a defendant in the place of Reliance. LIGA was established by the legislature as part of the Louisiana Revised Statutes, Title 22, Insurance, Chapter 1, Insurance Code. The purpose of LIGA can be found in La.R.S. 22:1376, which states in part;

2

"[t]he purpose of this Part is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer." Louisiana Revised Statute 22:1386(A) provides as follows:

> A. Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer which is also a covered claim, shall be required first to exhaust his rights under such policy. Such other policies of insurance shall include but shall not be limited to liability coverage, uninsured or underinsured motorist liability coverage, or both, hospitalization, coverage under self-insurance certificates, coverage under a health maintenance organization or plan, preferred provider organization or plan, or similar plan, and any and all other medical expense coverage. All entities that are prohibited from recovering against the association, as specified in R.S. 22:1379(3)(b), shall also be considered insurers for purposes of this Subsection. As to the association, any amount payable by such other insurance shall act as a credit against the damages of the claimant, and the association shall not be liable for such portion of the damages of the claimant.

Thus, when Reliance became insolvent, Farm Bureau became the "primary" insurer, i.e., the insurance company to which Plaintiffs had to look first, for payment of their damages. Under the provisions of the insurance code, LIGA only became liable for any damages in excess of those recoverable from Farm Bureau, i.e., those damages in excess of $105,000.00.

After hearing the testimony and examining the medical records, bills and depositions entered into evidence, the trial judge found that Plaintiffs had not proven that their damages exceeded the amount for which Farm Bureau was responsible.

This appeal turns on factual determinations of the trial judge. Recently, in *Cenac v. Public Access Water Rights Assn.*, 02-2660, pp. 9-10 (La. 6/27/03), 851 So.2d 1006, 1023, our supreme court reviewed the law applicable to the appellate review of cases involving factual determinations at the trial level:

> In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard which

3

precludes the setting aside of a trial court's finding of fact unless those findings are clearly wrong in light of the record reviewed in its entirety. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A reviewing court may not merely decide if it would have found the facts of the case differently, the reviewing court should affirm the trial court where the trial court judgment is not clearly wrong or manifestly erroneous. *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221.

At trial, counsel for Plaintiffs stipulated that LIGA was entitled to a "credit" equal to Farm Bureau's exposure. However, on appeal he argues that this "credit" should not extend to Mr. Richard and/or Premiere, stating that the trial judge, this court and the fifth circuit erred in finding so. *See Stagg v. Strauss*, 94-670 (La.App. 3 Cir. 12/7/94), 647 So.2d 621 and *Winter v. F.A. Richard & Associates, Inc.*, 95-578 (La.App. 5 Cir. 11/28/95), 665 So.2d 611. We reject Plaintiffs' argument and will continue to follow *Stagg* until the legislature changes the law or the supreme court rules adversely to that decision.

As to the damages awarded, after the trial, the trial judge made the following findings of fact:

> 1. Defendant Todd Richard's negligence was the sole cause in fact of the accident and the damages sustained by the plaintiffs, Jessica Broussard and Lannah Broussard;
>
> 2. Defendant Todd Richard was in the course and scope of his employment with Premiere, Inc. at the time of the accident and therefore Premiere, Inc. is responsible for his negligence;
>
> 3. The plaintiffs have shown that as a result of the accident Lannah Broussard suffered a temporomandibular joint syndrome, cervical strain injury, bilateral sacroiliac joint injuries, loss of enjoyment of life, and that plaintiff Jessica Broussard suffered a loss of consortium;
>
> 4. The plaintiffs have failed to prove that the accident of November 19, 1998, caused plaintiff Lannah Broussard to suffer fibromyalgia, any permanent disability, any loss of earning capacity; and any future damages, general or medical.
>
> Considering the foregoing, and the fact that the parties agree that LIGA is entitled to a credit of either $100,000 or $105,000; the Court

4

finds that plaintiffs' claims do not exceed the lesser agreed on amount of $100,000. Therefore, the claim against LIGA is dismissed.

Considering that the trial court's finding that "plaintiffs' claims do not exceed the lesser agreed on amount of $100,000," is a factual finding, we will undertake a manifest error review of Plaintiffs' damages.

First, we address Lannah's TMJ injury. Dr. James Pearce treated Lannah from December 2, 1998, until October 25, 1999, when he had found she had reached "maximum medical improvement concerning her temporomandibular disorder." However, he advised her to continue to wear her splint at night "due to the deleterious effects of her nocturnal bruxism." There is nothing in the record to connect her nocturnal bruxism with the accident of November 19, 1998.

On appeal, Plaintiffs argue that Lannah is permanently disabled due to fibromyalgia and because of this disability she has sustained, among other things, a loss of future earning capacity. Besides her TMJ injury, Lannah's other major complaints following her first accident consisted of pain in her neck, shoulders and lower back and headaches. The two doctors which were most involved in treating these symptoms were Dr. Leo deAlvare, a neurologist and Dr. Angela Mayeux, an orthopaedic surgeon. Dr. deAlvare treated Lannah between May 1999 and May 2000. Her initial examination revealed "[m]ultiple areas of muscle spasm" in the muscles on the sides and back of her neck. She also had a positive "Figure-4" test which indicated o problem in her pelvic region. That problem was later diagnosed as sacroiliitis. Dr. deAlvare mainly treated Lannah for her headaches. He prescribed an anti-inflammatory and a muscle relaxant for the spasms, a tricyclic to help her sleep and to help prevent headaches, and an analgesic. He also started Lannah on a course of physical therapy. Lannah stopped going to physical therapy after only a few visits, claiming it only provided temporary relief. In July 1999, Dr. deAlvare did a nerve

conduction test on Lannah's lower extremities which resulted in normal findings. Because of the continued pain in neck and shoulders, Dr. deAlvare restarted her physical therapy, this time with Ruud Vuijsters. As the pain in her sacroiliac (SI) joints continued, Dr. deAlvare referred Lannah to Dr. Mayeux in September 1999. At that point, Lannah continued treatment with both physicians. Dr. deAlvare's notes of Lannah's October 13, 1999 visit that her head and neck aches were improving, but she still complained of SI problems. On October 8, 1999, Dr. Mayeux injected Lannah's SI joints. According to Dr. Mayeux, when she saw Lannah on October 13, 1999, Lannah " was much better. Her left SI joint was documented as markedly improved, her right about 75 percent better." Dr. Mayeux saw Lannah again on November 3, 1999. Although Lannah had related that her headaches had improved to Dr. deAlvare on October 13th, and been released by Dr. Pearce as having reached maximum medical improvement on October 25th, she complained to Dr. Mayeux of both headaches and TMJ pain on that visit. Lannah did state that her SI joint problems had improved, but still complained of neck and "upper back" [shoulder?] pain. Dr. Mayeux noted that Lannah was "woefully out of shape. And [would like to] see if, by strengthening her trunk and all, we can knock down a lot of her problems. Dr. Mayeux concluded: "Basically I didn't find a lot of anatomic reasons for her complaint[s]."

Concerning Lannah's last visit on January 20, 2000, Dr. Mayeux testified as follows:

> Basically she was having some recurrence of problems, but I sat down and talked to her, and, she tried out for the tennis team. And this was a child who was not in shape at all. I'm not surprised that she had some problems when she tried to get back to athletics. So I went --took some time, went through a bunch of things that she could do to get back in shape. She had a normal physical exam on that day. I felt that if she got back in shape, she could go about her regular activities.

. . . .

> Basically she had a normal physical exam on that date. She had no muscle spasm. Her SI joints were well lined up. And so basically at that point I felt that this probably was just musculoskeletal from being out of shape.

In sum, Dr. Mayeux conclude that any back pain Lannah complained of on January 20, 2000, was from being out of shape and trying out for the tennis team, and *not* related to her accident of November 19, 1998.

Dr. deAlvare saw Lannah on February 8, 2000. At that time Lannah reported that her headaches, neck pain, and SI joint problems were all better. On that date she made her first complaints of upper lumbar and lower thoracic pain. Lannah did *not* relay to Dr. deAlvare that she had been involved in another accident on January 28, 2000. Dr. deAlvare found some trigger point in her back during his examination of February 8, 2000, and injected these to see if he could provide some relief. At trial, when asked if he attributed Lannah's upper back symptoms to her accident of November 19, 1998, Dr. deAlvare testified:

> No. I think it was probably, you know, if, indeed, that's the case [that Lannah had been involved in a second accident on January 28, 2000], then I would think that -- well, it seemed unusual to me that, after she had been getting better, all of a sudden, we've got a bunch of muscle spasms again. Unusual, but not unheard of. But a better explanation might be that she had re-injured herself. And if, indeed, that was the case, that would be very consistent with my exam.

When asked if he though it was necessary to continue her treatment past February 8, 2000, Dr. deAlvare stated:

> No. I saw her after February. I wanted to see her one more time. I actually wanted to see her in March, I guess that would have been. She ended up coming back in May just to try to clean up, finish everything up, get her off the medicines, because she was still on the medicines. Had there not been any intervening trauma, I believe that she would have been at her maximum medical improvement on that visit in February, and we probably would have taken her off the medicine right then and there.

7

Plaintiffs also claim that Lannah developed winging of her scapulae and fibromyalgia as a result of the November 1998 accident. Winging of her scapulae was diagnosed by Dr. Robert Franklin, who first saw Lannah on February 11, 2000, after her second accident. Fibromyalgia was diagnosed by Dr. Ladislas Lazaro, IV, and confirmed by Dr. Paul Ware, neither who saw Lannah before her second accident. Both Drs. deAlvare and Mayeux examined Lannah for winging of the scapulae, and both found no evidence of this condition.

As to the fibromalgia, Dr. Mayeux stated that she hated to sound like a skeptic, but in her experience patients with fibromyalgia complain of chronic fatigue and have multiple palpable trigger points. She stated that Lannah never complained to her of fatigue or insomnia and that on Lannah's November 1999 visit, she could only find one small trigger point. Dr. deAlvare did not find trigger points in Lannah's upper back until after her second accident. Dr. Lazaro, who first concluded that Lannah had fibromyalgia, did not see her until August 31, 2000, some seven months after her second accident.

Dr. Paul Ware, who specializes in treating patients with fibromyalgia saw Lannah twice: once one January 23, 2001, and the second time on October 17, 2001. He stated the diagnosis of fibromalgia depends on "the symptom complex and then the trigger points and the location of the trigger points." He stated that there are eighteen trigger points, nine on each side of the body and that to have a definitive diagnosis, one would have to elicit a pain response at, at least, eight of these trigger points. Dr. Ware further stated that "I think that I would not want to make the diagnosis [of fibromyalgia] without some trigger points." He testified that Lannah had no trigger points on either of her visits; yet, he testified, that based on his review of her medical records, Lannah had fibromyalgia.

Finally, Plaintiffs argue that Lannah suffers from depression brought on by the injuries she suffered in the November 1998 accident and the inability of her treating physicians to provide her with complete relief. We note that Lannah sought no care from any mental health profession until after the death of Michael Deville, her "step-father."

When we consider that neither of the two doctors who treated Lannah for the longest time, Drs. deAlvare and Mayeux, were of the opinion that she had either winged scapulae or fibromyalgia, that they both were of the opinion that she had reached maximum medical improvement and that her accident of November 1998, would require no further treatment, that Lannah has been described as a poor historian and that her statements to those doctors have been described as less than accurate, that she had no positive diagnosis of fibromyalgia until after her second accident, and that she sought no treatment from any mental health professional until after the death of Michael Deville in June of 2000, we cannot say that the trial judge was manifestly erroneous or clearly wrong in his finding that Plaintiffs had failed to prove "that the accident of November 19, 1998, caused plaintiff Lannah Broussard to suffer fibromyalgia, any permanent disability, any loss of earning capacity; and any future damages, general or medical."

Without proof of those items, we, too, as did the trial judge, find Plaintiffs' damages fail to exceed the $100,000.00 available to Plaintiffs under the UM provision of the Farm Bureau policy.

Accordingly, for the reasons stated, the judgment of the trial court is affirmed. All costs of this appeal are assessed against Plaintiffs, Jessica and Lannah Broussard.

**AFFIRMED.**

9