# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-1446


CELIA ANN MARKS, ET AL.

VERSUS

OHMEDA, INC., ET AL.

**********

### APPEAL FROM THE
### TWENTY-SEVENTH JUDICIAL DISTRICT COURT
### PARISH OF ST. LANDRY, NO. 98-C-3906-B
### HONORABLE A. FRANK MCGEE, DISTRICT JUDGE

**********

### ARTHUR J. PLANCHARD
### JUDGE
**********

Court composed of Glenn B. Gremillion, Billy Howard Ezell, and Arthur J. Planchard[*], Judges.

**AFFIRMED.**


**Vance A. Gibbs and**
**Randal R. Cangelosi**
**Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P.**
**One American Place, 22nd Fl.**
**Baton Rouge, LA 70821**
**Counsel for Defendant/Appellant:**
    **OHMEDA, Inc.**

**H. Alston Johnson, III and**
**Jane H. Barney**
**Phelps, Dunbar, LLP**
**445 North Boulevard, Ste 701**
**Baton Rouge, LA 70821-4412**
**Counsel for Defendant/Appellant:**
    **OHMEDA, Inc.**

---

[*] Judge Arthur J. Planchard, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Hon. Harry T. Lemmon**
**650 Poydras St., Suite 2335**
**New Orleans, LA 70130**
**Counsel for Defendant/Appellant:**
      **OHMEDA, Inc.**

**Randy P. Angelle**
**Bernard & Angelle**
**P. O. Box 3265**
**Lafayette, LA 70502**
**Counsel for Secondary Plaintiffs/Appellants:**
      **Celia Ann Marks, et al.**

**Lawrence K. Burleigh, Sr. and**
**Lawrence K. Burleigh, Jr.**
**Lawrence K. Burleigh, Ltd.**
**100 E. Vermilion St. Suite 160**
**Lafayette, LA 70501**
**Counsel for Secondary Plaintiffs/Appellants:**
      **Celia Ann Marks, et al.**

**S. Gary McGoffin and**
**Daniel C. Palmintier**
**DURIO, McGOFFIN, STAGG & ACKERMANN**
**P. O. Box 51308**
**Lafayette, LA 70505**
**Counsel for Defendant/Appellee:**
      **Doctors' Hospital of Opelousas, L.P.**

**William E. Bourgeois**
**Bourgeois & Bourgeois, L.L.C.**
**P. O. Drawer 2255**
**Monroe, LA 71207-2255**
**Counsel for Defendant/Appellee:**
      **The Estate of Jamie Gibson, CRNA**

PLANCHARD, Judge[1].

Defendant, OHMEDA, Inc., appeals a judgment of the trial court finding it solely responsible for the damages sustained by Plaintiff, Celia Ann Marks, and awarding her a total of $9,365,602.00, and awarding her daughter, Colleen Marks, $350,000.00, for her loss of consortium, both amounts plus legal interest from the date of judicial demand until paid. Plaintiffs also appeal praying that, in the event this court finds OHMEDA provided adequate warnings to Defendants, Doctors Hospital of Opelousas, LP and James D. Gibson, CRNA, that judgment be rendered against those parties. We affirm the judgment of the trial court.

**FACTS**

We adopt the facts as recited by the learned trial judge in his written Reasons For Judgment:

> Celia Marks was 35 years old at the time of surgery and had worked as a care-giver in nursing homes. In 1996, she was unemployed, but she was the primary care-giver to her father, daughter, and mother. Ms. Marks has a daughter, Colleen, who was five years old at the time of her mother's surgery.
>
> Celia Marks reported to Doctors' Hospital of Opelousas ("Doctors' Hospital") on October 10, 1997, for an abdominal hysterectomy. She underwent a preoperative physical. Her blood pressure was normal, and she had no family history of strokes. Her risk level was considered to be a Type III, which was due to her being overweight. Celia passed her physical and was accepted by Doctors' Hospital for surgery. Celia's surgery was the first surgery of the day in Operating Room V. Dr. John Ferrazzano performed an abdominal hysterectomy under general anesthesia. Celia was under anesthesia for approximately two and one-half hours. The anesthesia used during Ms. Marks' surgery was Isoflurane, and the carbon dioxide absorbent was Sodasorb. The anesthesiologist for the surgery was Dr. Daniel Baker, and Jamie Gibson was the certified registered nurse anesthetist. The anesthesia machine used in the surgery, the Modulus II Plus Anesthesia System, as well as the anesthetic, was manufactured by Ohmeda, Inc. ("Ohmeda").

---

[1] Judge Arthur J. Planchard, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

1

After surgery, Celia was transported to the recovery room and was taken off of oxygen at about 6:30 P.M.  Ms. Marks was then only responding to rigid stimuli, had difficulty getting out of bed, and was unable to walk.  CAT scans performed on October 13, 1997, at Doctors' Hospital and October 29, 1997, at Lafayette General Medical Center showed that Celia suffered subacute hemorrhagic infarct bilaterally involving the basal ganglia of the brain.

The injury to Celia's brain has caused her severe disabling injuries which are permanent in nature.  She now has slurred speech that is characterized by uncontrollable stuttering.  Ms. Marks is unable to walk independently, unable to drive, and unable to properly care for herself or her daughter, Colleen.  Celia Marks has experienced cognitive losses and also suffers from numerous psychological problems.

On October 8, 1998, the plaintiffs filed suit against Ohmeda, Inc., under the Louisiana Products Liability Act, and Doctors' Hospital and the Estate of Jamie Gibson, under the Louisiana Medical Malpractice Act.

All defendants deny responsibility in the case arguing that the plaintiff's problems are a result of a stroke while the plaintiff urges that she is a victim of carbon monoxide poisoning caused by a malfunction of the machine.

The case was tried to the trial judge over six days.  Numerous witnesses, both professional and lay, testified for both the Plaintiffs and the Defense.  In addition fifteen volumes of exhibits were introduced into evidence.  At the close of Plaintiffs' case, all Defendants made motions for involuntary dismissal.  After hearing extensive argument on the motions, the trial judge refused to rule on the motions, citing La.Code Civ.P. art. 1672(B) (emphasis ours), which states:

In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. *The court* may then determine the facts and render judgment against the plaintiff and in favor of the moving party or *may decline to render any judgment until the close of all the evidence.*

2

When a motion for involuntary dismissal is made under article 1672, the court must grant the dismissal if it finds that the plaintiff has not established his/her case by a preponderance of the evidence. *Bradley v. Hunter*, 413 So.2d 674 (La.App. 3 Cir.), *writ denied*, 415 So.2d 952 (La.1982). *See also Thornton ex rel. Laneco Const. Systems, Inc. v. Lanehart*, 97-2871 (La.App. 1 Cir. 12/28/98), 723 So.2d 1127, *writ denied*, 99-177 (La. 3/19/99), 740 So.2d 115. Hence, since the trial judge refused to rule on Defendants' motions, we must conclude that the trial judge believed that Plaintiff had established her case by a preponderance of the evidence.

**LAW AND DISCUSSION**

The law applicable to this case was recently reviewed by this court in *Broussard v. Premiere, Inc.*, 03-668, p. 4 (La.App. 3 Cir. 12/10/03), 861 So.2d 734, 736-37:

> This appeal turns on factual determinations of the trial judge. Recently, in *Cenac v. Public Access Water Rights Assn.*, 02-2660, pp. 9-10 (La.6/27/03), 851 So.2d 1006, 1023, our supreme court reviewed the law applicable to the appellate review of cases involving factual determinations at the trial level:
>
>> In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard which precludes the setting aside of a trial court's finding of fact unless those findings are clearly wrong in light of the record reviewed in its entirety. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A reviewing court may not merely decide if it would have found the facts of the case differently, the reviewing court should affirm the trial court where the trial court judgment is not clearly wrong or manifestly erroneous. *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221.

In the case sub judice, Plaintiffs base their action against Defendant upon La.R.S. 9:2800.57, which states in pertinent part:

3

A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

. . . .

C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

In *Goodrich v. Caterpillar, Inc.*, 30,762, pp. 3-4 (La.App. 2 Cir. 8/19/98), 717

So.2d 1235, 1237, our brethren of the second circuit stated the following:

Liability for fault is subject to a duty-risk analysis, which consists of the following four-prong inquiry:

(1) Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?

(2) Did the defendant owe a duty to the plaintiff?

(3) Was the duty breached?

(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

*See Mart v. Hill*, 505 So.2d 1120 (La.1987); *Roberts v. Benoit*, 605 So.2d 1032 (La.1991).

In determining whether there is a duty-risk relationship, the proper inquiry is how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. *Hill v. Lundin & Associates, Inc.*, 260 La. 542, 256 So.2d 620 (1972); *Roberts v. Benoit, supra*. Restated, the ease of association inquiry is simply: "How easily does one associate the plaintiff's complained-of harm with the defendant's conduct? . . . Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." *Roberts v. Benoit, supra*. Absent an ease of association between the duty

4

breached and the damages sustained, legal fault is lacking. *Roberts v. Benoit, supra.*

The question of whether a duty exists in a particular set of circumstances is a question of law for the court to decide. *Mathieu v. Imperial Toy Corporation*, 94-0952 (La.11/30/94), 646 So.2d 318; *Osborne v. Vulcan Foundry, Inc.*, 95-2766 (La.App. 4th Cir.5/29/96), 675 So.2d 837. The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Rules of conduct are designed to protect some persons under some circumstances against some risks. *Osborne, supra.*

As to the liability portion of the case, Defendant/Appellant argues that Plaintiffs failed to prove their case and alternatively that, even if Plaintiffs met their burden, the trial judge erred in failing to allocate some portion of fault to Ms. Marks' anesthesiologist and/or her nurse anesthetist.

Our examination of the record reveals that the following facts are uncontested:

1. Defendant, OHMEDA, is the manufacturer of both the anesthesia machine, a Modulus II Plus Anesthesia System, and the anesthetic agent, Isoflurane, used during Ms. Marks' surgery.

2. Under certain conditions, the machine and anesthetic combination can produce carbon monoxide during anesthesia.

3. OHMEDA knew of this fact and failed to place a warning sticker on the anesthesia machine or in the machine's operating manual.

4. OHMEDA did revise its product information leaflet for Isoflurane before Ms. Marks' surgery, but it did nothing to notify the users of the anesthetic that it had added a carbon monoxide warning in the leaflet's "Precautions" section.

5. Carbon monoxide poisoning during anesthesia is not a common event.

Our first inquiry is: what does the record show was the cause of Plaintiff's bilateral basal ganglia lesions? In his reasons for judgment, the trial judge stated the following:

Thus as the court appreciates this case in order to determine whether or not there is liability on the part of any defendant's the court must first answer the question of whether the plaintiff's injuries and

5

disability stem from a stroke or carbon monoxide poisoning. In addressing the issue, the court is not unmindful of the many witnesses who testified on behalf of all parties nor is the court unmindful of the many days in court that were spent on their testimony. However, after all of that is considered the court was more impressed with the testimony of the plaintiffs' medical experts than those of the defendant's. The court was particularly impressed with the testimony of Dr. Steven Rees (in court) and Dr. Paul Harch (by deposition). Their testimony was straight forward and unequivocal but, most of all, it was believable. Accordingly, it is the opinion of the court that the evidence supports a finding that Celia Marks' injuries and disability are attributed to carbon monoxide poisoning and not to a stroke.

Dr. Steven J. Snatic, a neurologist, testified that tests showed that Ms. Marks did not suffer a stroke inasmuch as a SPECT scan demonstrated there was no evidence of blocked blood vessels or lack of blood flow to the area of the lesions. He stated that, in his mind, carbon monoxide poisoning was the cause of Ms. Marks' lesions; that there were no other more likely explanations. In a letter to Plaintiffs' counsel, Dr. Snatic stated: "I feel it is more likely than not that Celia Marks suffered carbon monoxide poisoning as a result of anesthesia back in the Fall of 1997."

Near the beginning of his deposition, Dr. Paul Harch, who is board certified in bot emergency and hyperbaric medicine, stated the following: "I have an opinion about this patient [Ms. Marks] and what happened to her, and I believe she was exposed to carbon monoxide and that is responsible for her pathology . . . I think it's probable that she was exposed through the anesthesia route." Later in the deposition he reiterated as follows:

> My basic opinion is that Celia Marks experienced an intraoperative carbon monoxide exposure that primarily injured her basal ganglia, and possibly other areas in the brain, and that this became in the postoperative period between about 6 p.m. and 10 p.m.
>
> The main support for this is the characteristic lesions seen on her CT and MRIs and the relative absence of any other explanation for this and any other documentation in the medical literature of the production

6

of this type of lesion that evidence can be found, in her case to account for it.

Dr. Harch then went on to list other possible causes of bi-lateral basal ganglia lesions and explain why each was not applicable in Ms. Marks' case. The testimony of Drs. Snatic and Harch was supported by the testimony of Dr. Steven Rees, a specialist in physical and rehabilitation medicine, who treated Plaintiff after her operation. Dr. Rees stated that Plaintiff's lesions were consistent with carbon monoxide poisoning. Additionally, Dr. Carlos R. Gorbitz, a neurosurgeon, who testified via video deposition because he was retiring to Spain, fully supported Dr. Harch's opinion.

The trial court not only found that Plaintiff's injury was caused by carbon monoxide poisoning, but also, that the source of the carbon monoxide was the OHMEDA machine and anesthetic:

> This next brings us to the question as to where the carbon monoxide poisoning come from. We know that Ms. Marks was not suffering from carbon monoxide poisoning when she came into the hospital and we know that once she was in her private room after surgery she eventually had the classic symptoms of carbon monoxide poisoning. There was no evidence that she was poisoned in her pre-opt room, no evidence she was poisoned in the recovery room, no evidence of poisoning in her post-opt private room. Accordingly, she could only have been poisoned in the operating room. Next, the evidence is clear that in the operating room the only source of carbon monoxide poisoning comes from an improper mixture of the anesthesia, Isoflurane, and the filtering/absorbent agent, Sodasorb.

That conclusion is also supported by the testimony of Drs. Snatic, Harch, Rees and Gorbitz as noted above.

Defendant attempted to show that there were other possible causes of Plaintiff's lesions. Their primary suspect was stroke. Defendant called a number of witnesses who testified that because of Ms. Marks' sex and weight, and because of some medications she was taking, she was more susceptible to stroke than others her

7

age. The Defense also put on testimony that it was possible for Ms. Marks to have sustained injury because of insufficient oxygenation of her blood due to a combination of her weight (which would cause shallow breathing in a supine position) and the discontinuance of oxygen the evening after her operation. The Defense also pointed out that production of carbon monoxide during anesthesia, using its machine and anesthetic is a rare event.

It is well settled that where there is a conflict in the testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even if the appellate court may feel that its own evaluations and inferences are as reasonable. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978); *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967 (La.1985). In the case sub judice, we are faced with just such a situation—Plaintiff put on evidence which supports the trial judge's findings, while the Defendant's witnesses argued an alternate theory. Under the well established rules of appellate review, we cannot say the trial court's findings on the two issues of causation, what caused Plaintiff's injury (the carbon monoxide) and how it entered Plaintiff's blood, are clearly wrong or manifestly erroneous.

Having found the trial judge did not err in concluding that Ms. Marks' injury was caused by carbon monoxide introduced into her system during anesthesia, we now turn to a duty-risk analysis of the case to determine if Defendant is legally liable for Plaintiffs' damages.

Louisiana Revised Statute 9:2800.57(C) clearly establishes a duty upon a manufacturer "to use reasonable care to provide an adequate warning of such characteristic [i.e., one that may cause danger] and its danger to users and handlers

8

of the product." The evidence clearly shows that OHMEDA breached this duty. It took no direct action to notify the users of its Modulus machines of the potential of generating carbon monoxide during anesthesia. OHMEDA argues that articles which appeared in trade publications were sufficient to warn the medical community. We find this is not sufficient; the duty established by La.R.S. 9:2800.57(C) is a duty placed directly upon the manufacturer. It cannot be delegated. OHMEDA'S argument that its warning to "Verify canister seal with level in full Lock position and insure adequate *capacity* of Soda Lime" warned of the possible danger encountered by Plaintiff. We find this argument without merit. The evidence established that the only *capacity* of the soda lime that could be determined by simple inspection was the capacity of the soda lime to absorb *carbon dioxide*. The soda lime was impregnated with a chemical which changed color as the soda lime's ability to absorb *carbon dioxide* was diminished. The was no indicator by which its ability to absorb *carbon monoxide* could be detected.

Did OHMEDA's duty extend to this Plaintiff? Without a doubt. OHMEDA knew the machine was going to be used to provide anesthesia to patients undergoing surgical procedures. This is what the machine was designed to do. OHMEDA had a duty to each patient to insure that the machine provided anesthesia in a safe manner, and, when it discovered the possibility that the machine could generate carbon monoxide while providing anesthesia, it had a duty to warn the users of its machines of this dangerous characteristic so that patients could be protected from possible harm.

We agree with the trial judge's findings that OHMEDA's failure to warn of the dangerous characteristic of its machine was the direct cause of Plaintiff's injuries and

that the risk and harm caused was well within the scope of the duty breached. We find no error on the part of the trial judge regarding these conclusions.

OHMED argues that the trial judge erred in not assessing any fault to Ms. Marks' anesthesiologist, her nurse anesthetist, or any hospital employee. Last year, this court reviewed the principles applicable to the appellate review of the apportionment of fault in *Cleland v. City of Lake Charles*, 02-805, p. 14 (La.App. 3 Cir. 3/5/03), 840 So.2d 686, 696, *writs denied*, 03-1380, 03-1385 (La. 9/19/03), 853 So.2d 644, 645, wherein we stated:

> Apportionment of fault is a question of fact, subject to the manifest error/clearly wrong standard of review. *Sims v. State Farm Auto Ins. Co.*, 98-1613 (La.3/2/99); 731 So.2d 197. In reviewing allocation of fault, the Louisiana Supreme Court in *Clement v. Frey*, 95-1119, p. 7 (La.1/16/96); 666 So.2d 607, 610-11, explained, "there is an analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence."

OHMEDA failed to warn any of these parties of the dangerous characteristic of its machine. It failed to send a simple letter and warning sticker to either the hospitals or to the medical professionals who used its products. Further, even though company representatives made regular calls to the hospital and the medical professionals, they failed to inform the parties of the possibility that their Modulus machines could generate carbon monoxide during routine anesthesia. Testimony established that the injury to Ms. Marks happened during the administration of anesthesia using an OHMEDA machine and an anesthetic agent manufactured by the same company. We find no evidence that the want of skill by any person caused her injury. We find no error in the trial court's allocation of fault solely to OHMEDA.

10

The Defendant also argues it should not be held liable because of the "learned intermediary doctrine." In *Brown v. Glaxo, Inc.*, 99-1531, pp. 4-5 (La.App. 1 Cir. 11/15/00), 790 So.2d 35, 38-39, *writs denied*, 00-3457, 01-35 (La. 2/09/01), 785 So.2d 827, 832, our brethren of the first circuit explained:

> A product may be unreasonably dangerous, and the manufacturer liable, if an inadequate warning proximately caused the damage. Additionally, the damage must arise from a reasonably anticipated use. La. R.S. 9:2800.54 A & B(3); 9:2800.57 A. An adequate warning is one that "would lead an ordinary reasonable user . . . to contemplate the danger in" the use of the product. La. R.S. 9:2800.53(9). However, under the "learned intermediary doctrine," the doctor acts as an informed intermediary between the drug company and the patient. Thus, a drug manufacturer has a duty to warn the prescribing doctor, rather than the patient, of potential risks associated with the use of the drug. This duty is fulfilled when the prescribing doctor is informed of the potential risks from the drug's reasonably anticipated use so that the physician may intelligently decide on its use with the particular patient. The doctor must then advise the patient accordingly. *Mikell v. Hoffman-LaRoche, Inc.*, 94-0242, pp. 7-8 (La.App. 1 Cir. 12/22/94), 649 So.2d 75, 79-80. If the warning is "accurate, clear, and unambiguous," then the adequacy of the warning is a question of law. *Calhoun v. Hoffman-LaRoche, Inc.*, 98-2770, p. 6 (La.App. 1 Cir. 2/18/00), 768 So.2d 57, *rehearing granted on other grounds*, 98-2770 (La.App. 1 Cir. 2/18/00), 768 So.2d 57, *writ denied*, 00-1223 (La.6/23/00), 765 So.2d 1041. We note that " '[r]easonably anticipated use' " is defined as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. R.S. 9:2800.53(7).

Defendant's "learned intermediary" defense fails because OHMEDA did nothing to inform either Plaintiff's anesthesiologist or her nurse anesthetist of the dangerous characteristic of its Modulus machine.

Finally, we turn to OHMEDA's argument that the damages awarded to Plaintiffs were excessive and that the trial court erred in awarding pre-judgment interest on Plaintiff's future damage award.

We address the latter issue first. Both in brief and at oral argument, Defendant relied heavily on *Hall v. Brookshire Brothers, Ltd.*, 02-2404, 02-2421 (La. 6/27/03),

11

848 So.2d 559, for the proposition that such an award is "inequitable and even nonsensical." We find *Hall* completely inapplicable to the case sub judice. *Hall* dealt with awards which are limited under the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41 et seq. In Hall the court explained:

> The legislature has evinced a clear intent in LSA R.S. 40:1299.42(B)(1) to limit recovery of damages (exclusive of future medical care and related benefits) to $500,000.00 plus interest and costs. The statute does not authorize the recovery of interest on damages in excess of the statutory limit, and consistent with the purpose of the Medical Malpractice Act to lower the costs of health care generally and assure the availability of health care for the public, we decline to read such a requirement into the statute. *See, Allen v. State*, 535 So.2d 903, 914-915 (La.App. 2 Cir.), *writ denied*, 536 So.2d 1201 (1988).

*Id.* at 575.

The two other cases cited by Defendant also fail to limit interest on awards for future damages. In the first case, *Sharkey v. Sterling Drug, Inc.*, 600 So.2d 701, 718 (La.App. 1 Cir.), *writs denied*, 605 So.2d 1099, 1100 (La.1992), the court stated:

> Sterling argues that the interest on damages for future losses should run from the date of judgment, and assigns error to the trial court's award of interest on all damages from the date of judicial demand. Although Sterling's argument is persuasive, and might perhaps be addressed to the legislature, we find no error in the trial court's judgment. See LSA-R.S. 13:4203; *Schwamb*, 516 So.2d at 467.

And in *Schwamb v. Delta Air Lines, Inc.*, 516 So.2d 452, 467 (La.App. 1 Cir. 1987), *writs denied*, 520 So.2d 750 (La.1988), the case cited in *Sharkey*, the court observed:

> The trial court awarded interest from the date of judicial demand on all damages, even damages awarded for future losses. Delta contends that this was error, and that interest should run on damages for future losses only from the date of judgment.

> Although Delta's argument is persuasive, and should perhaps be addressed to the Legislature, we find no error in the trial court's award of interest on all damages from the date of judicial demand.

12

Thus, we dismiss Appellant's argument that the trial court erred in awarding pre-judgment interest on the future damage portion of Plaintiff's award.

We now turn to the quantum of the award. The trial court's award was mainly based upon an extensive report by Robert Voogt and Associates, Inc., Rehabilitation Consultants, the deposition testimony of Dr. Robert Voogt, a certified rehabilitation counselor, and the trial testimony of Dr. George R. Rice, Professor Emeritus of Economics at Louisiana State University. Plaintiff also presented testimony from a number of other experts. The Defendant's expert in economics, Dr. Will C. Heath, Associate Professor of Economics at the University of Louisiana, Lafayette, presented testimony which disagreed with Plaintiffs' experts. Dr. Rice estimated the present value for Plaintiffs' care plan at $4,326,273.00, while Dr. Heath put that figure at $3,241,4243.00. We note that the testimony of Dr. Heath was not detailed, that he has limited experience in this type of case and that Appellant failed to put on any evidence to counter that offered in Dr. Voogt's deposition and report.

In his written reasons for judgment, the trial judge stated the following in reference to his award of damages:

> At the time of her unfortunate accident Celia Marks was a 35 year old single mother of a five year old daughter, Colleen. Ms. Marks worked the majority of her adult life and prior to surgery enjoyed taking care of her daughter, eating out, cooking, shopping, and managing her father's financial affairs.
>
> Celia can no longer work, drive, cook, shop, perform housekeeping chores, attend to financial affairs, or provide for herself or her daughter the most basic necessities of life. Due to her injuries, she can no longer walk without assistance and can only communicate with severe dysfluency that is characterized by stuttering. She suffers from psychological effects such as: depression; anger; social isolation; helplessness and role reversal, where Celia is now the child and Colleen is the parent. Dr. William Black found that Celia's deficits are significant and of a degree so as to impair her ability to function

13

independently. He testified that Celia needed a good life care planner to determine the amount of her future care.

Dr. Steven Rees testified that Celia's condition would continue to deteriorate and will require support care to meet her personal needs and the needs of her child, Colleen. Dr. Rees stated "Celia is unable to take care of herself and Colleen without assistance." A life care plan was provided to show the costs of future medical care, therapy, medications, and medical equipment that Ms. Marks will need for the rest of her life. The life expectancy provided for Ms. Marks is based on what the U. S. Government says is the average life expectancy plan for somebody of her age, sex, and race.

Dr. Voogt testified by deposition that she needs 24 hour care because she is not capable of independent living due to the brain damage that she suffered that is well documented by Dr. Black, and not because of her physical limitations. Her brain damage shows that she is impaired in all activities of adult brain functioning. It was Dr. Voogt's opinion that Ms. Marks needs a certified nurse assistant for the same reason that you would not leave a child home alone. She needs this nursing assistant to get her involved in the activities of daily living and allow her to be engaged as she once was and not just someone to turn on the T.V. for her.

The range for a certified nursing assistant is $10.00-15.00 per hour. A sitter would have to be available for Colleen that will run about $8.00 per hour. A sitter would have to be present with Colleen for 8-16 hours a day until she is 18 years of age. The Nurse Assistant will not take responsibility for the child, so that is why Colleen needs an additional person to watch over her well-being.

Dr. Voogt was questioned as to Dr. Black's assessment of [sic] that Ms. Marks condition might be deteriorating. He mentioned that often times a bench mark of CO poisoning is the deterioration of the patient's condition. Dr. Voogt stated that he agreed with Dr. Black in that Ms. Marks would not be able to return to independent functioning. Dr. Voogt mentioned that she knows that she is different from the way she was before surgery on October 10, 1997, when she underwent the surgery at Doctors' Hospital, but Celia does not have the cognitive skills to understand why she is now different. The purpose of the life care plan is to improve the quality of Celia Marks' life.

Dr. Robert Voogt's testimony as to Celia's future life care needs was uncontradicted. According to Louisiana jurisprudence, where the plaintiff's expert provided uncontradicted testimony regarding a life care plan, his expert opinion should be accepted by the trier of fact. Green v. K-Mart Corporation, 834 So.2d 1084 (La. App. 3 Cir. 2002)[*writ granted*, and judgment set aside because of filing of bankruptcy, 02-

14

3198 (La. 4/4/03), 840 So.2d 1209; *see also Johnson v. Ins. Co. of No. America*, 454 So.2d 1113, 1117 (La.1984)]. Therefore, this court will adopt Dr. Voogt's entire testimony as being the correct plan to implement to provide attendant care for Ms. Marks and Colleen for the entirety of Celia's life and until Colleen reaches the age of majority.

Dr. Randolph Rice provided expert economic testimony on behalf of the plaintiffs. The court was impressed that the testimony given by Dr. Rice was accurate and not inflated and will award Celia's wage-loss claim, the value of past attendant care for Celia and Colleen, as well as the value of Celia and Colleen's future care pursuant to that testimony.

The court will award **$615,450.00** to the plaintiffs for Celia's past attendant care expenses from the date of the injury to the date of trial and **$192,720.00** will be awarded based on the childcare expenses incurred for Colleen from the date of her mother's injury to the date of trial. Celia's father, Emery, has been the sole care giver to Ms. Marks and Colleen since the date of the injury. The courts are of the opinion that such care rendered gratuitously does not preclude the injured party from recovering the value of such services if they prove the need for the services, the reasonableness of the fee, and the extent and duration of the services. Tanner v. Fireman's Fund Insurance Companies, 589 So.2d 507 (La. App. 1 Cir. 1999); Bordelon v. Aetna Casualty & Surety, Co., 494 So.2d 1283 (La. App. 2 Cir. 1986). Dr. Rice based his testimony regarding Celia and Colleen's future life care needs and medical expenses on the plan provided by Dr. Voogt. The court is satisfied that their testimony supports an award of **$4,326,273.00** for the life care plan, discounted to present value, needed to provide adequate care to Celia and Colleen.

This court finds Celia's past wages that are due to her to be **$44,153. 00** and her future wages to be **$107,860.00**. The final amount of special damages that will be granted to the plaintiffs is **$79,146.64** that will provide for past medical expenses incurred by Celia Marks.

Celia Marks suffered catastrophic injuries as a result of carbon monoxide poisoning. She will never be able to function in the same capacity as she did before her surgery on October 10, 1997. Due to these injuries Ms. Marks is entitled to an award for past and future pain and suffering, past and future mental anguish, permanent physical and mental disability and limitations, and past and future loss of enjoyment of life which totals **$4,000,000.00.** In a similar case, the Third Circuit Court of Appeals increased a jury award of $280,500.00 to the lowest amount which in its discretion the jury could have reasonably awarded which was $2,000,000.00. The court is of the opinion that Ms. Marks injuries were more severe than the injuries suffered by the plaintiff in the above mentioned case. Johnson v. Kansas City Southern Railroad, 531 So.2d 773 (La. App. 3 Cir., 1988). In awarding the sum for general damages,

this court took notice of the fact that the related case was decided approximately fifteen (15) years ago and that the total awarded was the <u>minimal amount</u> and that a larger award could have been sustained.

Colleen's relationship with her mother has been permanently damaged due to the extent of Celia's injuries and she is entitled to an amount of **$350,000.00** for her loss of consortium claim.

Recently, in *Young v. Fitzpatrick*, 03-1038, p. _ (La.App. 3 Cir. 2/4/04), ___

So.2d ___, this court recounted the standards applicable in reviewing damage awards

stating the following:

The standard that an appellate court is to employ in reviewing a lower court's award of damages is described in the fourth circuit's decision in *Ross v. City of New Orleans*, 00-1879 p. 15 (La.App. 4 Cir. 11/21/01), 808 So.2d 751, 761 as follows:

With regard to the award of damages, there must be a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or low in proportion to the injury that it "shocks the conscience." *Moore v. Healthcare Elmwood, Inc.*, 582 So.2d 871 (La.App. 5 Cir.1991). Additionally, in deciding whether a trial court award was excessive, reviewing courts must first consider the individual circumstances of the subject case to determine whether the trial court abused its much discretion in setting the award. Only after determining that the award in the subject case was improper may the reviewing court consider awards in similar cases. *Brodtmann v. Duke*, 96-0257 p. 21 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 459-460.

Moreover, in *Wainwright v. Fontenot*, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74, the supreme court stated that:

[T]he assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993).

Before a trial court's award of damages can be questioned as excessive, the reviewing court must look to the individual circumstances of the injured parties which stand before the court. The reviewing court should not disturb a damage award absent a showing of a clear abuse of discretion.

In Louisiana, general damages include mental and physical pain and suffering, inconvenience, the loss of intellectual gratification and physical enjoyment, and other losses of lifestyle which cannot be measured exactly in monetary terms.

Our review of the record convinces us that the trial judge thoroughly "consider[ed] the individual circumstances of the subject case" before making his award. While we, or another trier of fact, may have made a different award, we do not find the award so high as to shock our conscience or to be a clear abuse of the vast discretion afforded a trier of fact in making damage awards.

Because of our finding in this matter we have no reason to address the appeal of the Plaintiffs in this matter.

Accordingly, for the reasons stated above, the judgment of the trial court is affirmed. All costs of this appeal are assessed against Defendant, OHMED, Inc.

**AFFIRMED.**